**K E C O INDUSTRIES, INC.**

v.

**The UNITED STATES.**

No. 277-56.

United States Court of Claims.
July 15, 1966.

Paul W. Steer, Cincinnati, Ohio, attorney of record, for plaintiff, Steer, Strauss, White & Tobias, Cincinnati, Ohio, of counsel.

Lawrence S. Smith, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, WHITAKER, Senior Judge, and LARAMORE, DURFEE and DAVIS, Judges.

## OPINION

PER CURIAM.

This case was referred to Trial Commissioner Richard Arens with directions

to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on May 18, 1964. Plaintiff filed exceptions to the commissioner's report and recommended conclusion of law with reference to claim No. 3 (Change Order No. 2), and in its brief, filed August 18, 1964, at p. 5 thereof, stated that no exception was taken by plaintiff with regard to the commissioner's opinion and recommendation concerning claim No. 1 (Spare Parts and Tools), and claim No. 2 (Excess Weight). The case was submitted to the court on plaintiff's exceptions to claim No. 3, the briefs of the parties and oral argument of counsel. By order of May 13, 1966, plaintiff was granted leave to file a post-argument memorandum with defendant granted leave to file a response thereto. No response has been filed by the defendant and the time granted therefor has expired. Since the court is in agreement with the opinion and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Therefore, it is concluded that as to claim No. 1 (Spare Parts and Tools), plaintiff is due $1,085.40; that plaintiff's claims No. 2 (Excess Weight) and No. 3 (Change Order No. 2) are denied; and that defendant is entitled to recover on its counterclaim the amount of $30,916, so that offsetting plaintiff's recovery on claim No. 1 against defendant's recovery on its counterclaim, defendant is entitled to recover a net judgment on the counterclaim in the amount of $29,830.60, and judgment is entered for defendant in that amount.

Commissioner Arens' opinion *, as modified by the court, is as follows:

Plaintiff was awarded four contracts in June 1952 by the Army Quartermaster Depot to produce 270 refrigeration units of which 170 were to be electric driven and of which 100 were to be gasoline driven. The only significant differences in the four contracts were in price and specifications for the 100 gasoline driven units.

Plaintiff makes three claims arising out of the contracts, which were the subject of decision by the contracting officer and thereafter, upon timely appeal by the Armed Services Board of Contract Appeals under the usual provisions on Changes and Disputes contained in Government supply contracts. Plaintiff contends that with reference to each claim the Board made legally erroneous interpretations of the contract documents, and/or that the decisions of the Board on the matters embraced in each claim were not supported by substantial evidence. Defendant, in addition to controverting plaintiff's claims, seeks recovery under its counterclaim on the theory that a legally erroneous formula was used by the Armed Services Board of Contract Appeals in deciding one of plaintiff's claims.

The only evidence in the case is the administrative record which was received in evidence in a pretrial conference and which consists of the contract documents, the transcript made before the Board, all exhibits considered by it, and the Board decision.[1]

(1)

*Spare Parts and Tools*

Plaintiff claims the sum of $20,038.10, representing the price of spare parts and tools furnished by it to defendant and amounts deducted from the contract price by defendant following deletions and substitutions in spare parts and tools.

The issue presented is whether under the contract defendant had only an op-

---

* The opinion, findings of fact and recommendation for conclusion of law are submitted under the order of reference and Rule 45(a), now Rule 57(a).

[1]. At the pretrial conference an order was entered directing plaintiff's counsel to file a detailed statement in the nature of an assignment of errors of law allegedly committed by the Board and a statement of the specific decisions of the Board which allegedly were not supported by substantial evidence. The order also required a responding statement by defendant's counsel.

tion to take and pay for spare parts and tools, as plaintiff contends, or whether plaintiff was obligated to furnish certain spare parts and tools within the contract price, and with an option to defendant to procure other items, as defendant contends.

The pertinent provisions of the contract documents are set forth in paragraph 4 of the Findings of Fact. These include the following specifications applicable to electric driven units:

3.5.8.1 *Spare parts.*—The refrigerating system shall be shipped complete with the following spare parts:

COMPRESSOR PARTS
(Four parts listed).

MISCELLANEOUS PARTS
(Thirteen parts listed).

3.5.8.2 *Tools.*—Each refrigerating system shall be shipped complete with the following tools:

SPECIAL MAINTENANCE TOOLS
(Fifteen tools listed).

Prior to the opening of the bids and the awarding of the contracts, the foregoing specifications were amended by Amendment No. 4 which reads in part:

### 7. *CONCURRENT SPARE PARTS —MAPI*

The right is reserved to the Government to select such items from the 'Combined Reference Data List' as it may deem appropriate and/or to add such items as components, parts, tools, etc., as may be required, to be shipped concurrently with each end item, in accordance with Section III, Part I and III of 'Instructions for the Preparation of Combined Reference Data Lists and Photographic Illustrations' dated 1 April 1952.

### 8. *CONCURRENT DEPOT SPARE PARTS SETS*

The Government reserves the right to purchase concurrent Depot Spare Parts Sets in accordance with Section III, Parts II and III of 'Instructions for the Preparation of Combined Reference Data Lists and Photographic Illustrations' dated 1 April 1952.

Amendment No. 4 also had in it the following statement in item 22, page 7, in reference to paragraph 3.5.8.1 of the specifications:

Spare parts—Delete 'compressor parts' shown on page 12 and at the top of page 13. Also, under Miscellaneous Parts delete items '1 and 4'.

The contract documents include the following specifications applicable to gasoline driven units:

3.4.8 *Spare parts and tools.*—

3.4.8.1 *Spare parts.*—The refrigerating system shall be shipped complete with the following spare parts:

COMPRESSOR PARTS
(Four parts listed).

MISCELLANEOUS PARTS
(Twelve parts listed).

3.4.8.2 *Tools.*—Each refrigerating system shall be shipped complete with the following tools:

SPECIAL MAINTENANCE TOOLS
(Fifteen tools listed).

Plaintiff makes two contentions of fact which it asserts caused doubt and confusion as to the meaning of the contract documents which plaintiff alleges were ambiguous. The first contention is that the list of spare parts and tools included in the specifications for each type of refrigeration unit (electric or gasoline driven) contained items which could not be used with that unit. Secondly, plaintiff contends that in a preaward conference plaintiff was advised by defendant in effect that spare parts and tools were not required to be furnished under the contract, except by special purchase under the option clauses. The evidence does not sustain either contention. (See paragraphs 5(a) and 5(b) of the Findings of Fact.)

Plaintiff further points out that in rejecting pilot model refrigeration units which were not accompanied by spare parts defendant's written rejection made no mention of spare parts and tools. The evidence establishes, however, (finding 6(e)) that the absence of spare parts and tools was orally called to the atten-

tion of plaintiff's agent by defendant's agent at the time of the inspection of the first pilot model and that plaintiff's agent expressed oral assurance that the spare parts and tools would follow.

Although defendant accepted shipments of refrigeration units in May 1953, without making deduction in payment because of absence of spare parts or tools, the evidence is that defendant's purchasing agent had no knowledge that the shipments did not include spare parts and tools and by July 1953 the parties were strongly asserting their respective and opposing positions on the issue by conference and correspondence. In the meantime, defendant was withholding $100 per refrigeration unit pending shipment of spare parts and tools. Thereafter, defendant made certain deletions and substitutions in the tools which, if tools are embraced within the contract price, would result in a price reduction.

On March 19, 1954, the contracting officer issued his findings of fact and decision with respect to various items in dispute, including the spare parts and tools issue, in which he ruled that spare parts and tools were embraced within the contract price which should be equitably adjusted downward because of a net reduction in value resulting from deletions and substitutions. After timely appeal and hearing before the Armed Services Board of Contract Appeals, the Board on March 30, 1956, sustained the contracting officer and denied that portion of plaintiff's appeal pertaining to spare parts and tools.

As indicated above, in addition to alleging that the Armed Services Board of Contract Appeals made legally erroneous interpretations of the contract documents, plaintiff alleges that the decisions of the Board on the matters embraced in each claim were not supported by substantial evidence. This raises the question of the test to be employed by the court in its consideration of the claims in the light of United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963) in which the Supreme Court concluded that, "apart from questions of fraud, determination of the finality to be attached to a departmental decision on a question arising under a 'disputes' clause must rest solely on consideration of the record before the department" under the standards contained in the Wunderlich Act. That act gives finality to the ultimate administrative determination of such question unless the decision thereon is "fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." 68 Stat. 81, 41 U.S.C. § 321 (1958).

■ The question presented in this claim, namely interpretation of the contract documents, is a question of law; hence, it is to be resolved independently by the court even though the sole record before the court is the administrative record. Beacon Constr. Co. of Mass. v. United States, 314 F.2d 501, 161 Ct.Cl. 1 (1963); WPC Enterprises, Inc. v. United States, 323 F.2d 874, 163 Ct Cl. 1 (1963); Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 162 Ct.Cl. 802 (1963), decided July 12, 1963; Wingate Constr. Co. v. United States, 164 Ct.Cl. 131 (1964).

■■ An examination of the contract documents does not reveal that the provisions relating to the furnishing of spare parts and tools were ambiguous as plaintiff suggests. These documents expressly provide that the refrigeration units were to be "shipped complete with the following spare parts" and were to be "shipped complete with the following tools," and in each instance the spare parts and/or tools were listed. It does not appear that the foregoing provisions are inconsistent with other provisions of the contract documents under which the Government reserved the right to purchase "components, parts, tools, etc., as may be required, to be shipped concurrently with each end item" in accordance with a Combined Reference Data List. The two sets of provisions can easily and reasonably be read together without one doing violence to the other. It is axiomatic in the law that a contract is to be

read from its "four corners." City of New York v. United States, 113 F.Supp. 645, 125 Ct.Cl. 576 (1953). Here the contract documents required plaintiff to furnish spare parts and tools and in addition provided an option to the Government to purchase components, parts, tools and other items. The only case cited by plaintiff on this issue is Farwell Co. v. United States, 115 F.Supp. 477, 126 Ct. Cl. 317 (1953) in which the question presented was whether a contract authorized substitution of copper tubing for brass or copper pipe. The court stated that it could not conclude from the contract documents that an ambiguity existed. There is a well established line of cases to the effect that "if some substantive provision of a government-drawn agreement is fairly susceptible of a certain construction and the contractor actually and reasonably so construes it, in the course of bidding or performance, that is the interpretation which will be adopted—unless the parties' intention is otherwise affirmatively revealed." WPC Enterprises, Inc. v. United States, supra. These cases are not, however, applicable to the instant case because the provisions under scrutiny here are not fairly susceptible of the construction which plaintiff advocates. In Russell & Pugh Lumber Company v. United States, 290 F.2d 938, 941, 154 Ct.Cl. 122, 128 (1961), the court stated "Since we have, in effect, determined that the document in question was not susceptible of an intelligent meaning other than that intended by the defendant, the line of cases which holds that an ambiguous contract susceptible of several possible meanings must be construed against the party which drew it likewise has no applicability to the present situation."

In Hotpoint, Inc. v. United States, 117 F.Supp. 572, 574, 127 Ct.Cl. 402, 406,

cert. denied, 348 U.S. 820, 75 S.Ct. 32, 99 L.Ed. 647 (1954), the court stated:

It is an elementary canon in interpreting a contract that the court should, where the language of the contract is unambiguous, ascertain and effectuate the intention of the parties as expressed by the language in the contract. In so doing the court should give the terms their usual and ordinary meaning even though the intention of one of the parties may have been different from that expressed. Hongkong & Whampoa Dock Co., Ltd. v. United States, 50 Ct.Cl. 213, and the cases cited therein.

It is concluded that plaintiff was obligated under the contract to furnish the spare parts and tools within the contract price. It is to be noted, however, that in paragraph 10 of the Findings of Fact the formula for the computation of plaintiff's costs, used by the Board in arriving at a charge back (reduction in contract price) because of deletion of spare parts and tools, is revised so as to eliminate a profit factor [2] and to reduce general administration expense. This results in a reduced charge back against the contract price for the deleted spare parts and tools.

It follows then that there is due plaintiff on its claim (1) for spare parts and tools the sum of $1,085.40, representing the difference between the amount computed under the formula used by the Armed Services Board of Contract Appeals as the charge back for the deleted spare parts and tools, and the amount of such charge back recalculated in the revised formula.[3]

(2)

*Excess Weight*

Plaintiff claims the sum of $483.23 which was withheld from contract pay-

---

2. Elimination of a profit factor on deleted items is necessary in order to avoid loss to plaintiff resulting from the deletion. For discussion of proper formula for equitable adjustment in a "loss contract" situation, see comments under claim (3) infra.

3. There is an established line of cases in which the criteria, measures, ingredients, or rules of damages are treated as matters of law. Laburnum Construction Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339 (1963); Lilley-Ames Co. v. United States, 293 F.2d 630, 154 Ct.Cl. 544 (1961).

ments by defendant for transportation charges due to weight of the refrigeration units in excess of the following provision of the contract:

GUARANTEED SHIPPING WEIGHT:

1,900 lbs. each—Item 3
1,500 lbs. each—Item 2

The controversy on this claim centers on Item 2 which was the electric motor driven refrigeration unit.

Plaintiff's position in essence is that design changes which plaintiff alleges were "required" by the Government in the refrigeration units under provisions of the contract documents relating to design and construction, caused the excess weight and thus plaintiff should not be held to the guaranteed weight.

The contract documents required plaintiff to submit to the contracting officer drawings covering the assembly of the entire refrigeration unit and further provided that fabrication should not commence until the drawings had been approved. The contract documents also required plaintiff, before commencing production, to submit to defendant a preproduction sample for approval, and that the sample meet certain tests. The contract specifications provided:

3.4 Design and construction.—Design and construction shall conform in general with the attached drawings and as hereinafter specified.

\* \* \* \* \* \*

3.4.2 *Construction.*— \* \* \* The net weight, exclusive of refrigerant, gasoline, oil and water, shall not exceed 1500 pounds.

Plaintiff submitted three designs which were rejected by defendant. Thereafter, plaintiff's representative and defendant's representative conferred "on several of the disputes then existing" at the office of the Quartermaster General. Plaintiff's representative subsequently testified before the Armed Services Board of Contract Appeals that in coming to an agreement with defendant's representatives regarding a design "insisted upon by the Government" plaintiff accepted a design which resulted in substantially heavier units than the units would have been under the design which plaintiff had previously submitted. As noted in the Findings, however, (paragraph 13 (b)) there is no evidence that the design which was approved by defendant's representatives was outside the contract specifications or that defendant's representatives acted in bad faith or in an arbitrary manner in rejecting the designs plaintiff submitted or in working out with plaintiff's representative an acceptable design; nor does the evidence establish that plaintiff could not have produced the units in compliance with the approved design without exceeding the guaranteed shipping weight.

Further light is shed on the intent of the parties by an inspection report of April 2, 1953, at the time of the rejection of the first pilot model. This report stated, " \* \* \* Previous authorization was given to employ a steel frame *if the weight limitation was not exceeded.*" (Emphasis added.)

On March 30, 1956, the Armed Services Board of Contract Appeals affirmed the decision of the contracting officer that plaintiff was liable for the excess shipping costs.

In attempting to prevail on this claim in the face of the clear contract provision on guaranteed weight, plaintiff assumed the burden of establishing that some act or conduct on the part of defendant intervened to relieve it of compliance with the provision. The Board did not find any such act or conduct on defendant's part. The Board pointed out that no claim was made by plaintiff that the design requirements

called for anything beyond the specifications.

■ It cannot be said from the facts of this case, moreover, that the acceptance by defendant of units which were in excess of the specification weight limitations constituted a waiver by defendant of the separate contract provisions requiring plaintiff to pay for transportation charges due to the excess weight.

■ The evidence from the entire administrative record which is before the court falls short of establishing a basis for setting aside the plain wording of the contract, and, accordingly, plaintiff's claim (2) must be denied.

### (3)

#### Change Order No. 2

Of the four contracts awarded to plaintiff for the production of the 270 refrigeration units, one of the contracts was for 100 electric driven units and 100 gasoline driven units. All of the units called for in the other three contracts were to be electric driven. The contract price for the gasoline driven units was $1,720 each and the contract price for the electric driven units was $1,271 each, or $449 less per unit.

In June 1953 before plaintiff had produced any gasoline driven units, the contracting officer wrote to plaintiff that in accordance with the Changes article of the contract the 100 gasoline driven units were to be changed to 100 electric driven units.[4] By responding letter, plaintiff advised that it was agreeable to the change and would allow a credit of $28,600 against the contract price. Shortly thereafter, plaintiff wrote to defendant that it would increase the credit to $32,850. The contracting officer considered that the contract price should be reduced by the difference in contract price of the two types of units; in other words, that the reduction should be 100 times $449, the

difference between $1,720 and $1,271, or $44,900.

Plaintiff then made revision in its request for contract adjustment because of the change order by requesting an increase in the unit price of the changed units. Its ultimate position was that it was entitled to a price adjustment of $1,919.51 per unit for the 100 changed units, representing cost (including extra. compensation for spare parts and tools), plus profit. This was, of course, higher than the contract price of either the electric or gasoline units.

A Government audit which is amply supported by the record revealed that although the unit contract price on the electric refrigerators was $1,271 and the unit contract price on the gasoline refrigerators was $1,720, plaintiff's costs on the electric refrigerators were $1,603.58 and on the gasoline refrigerators were $1,868.80. Plaintiff was therefore sustaining a unit loss of $332.58 on the electric refrigerators as against a unit loss of $148.80 on the gasoline refrigerators.

The contracting officer in his decision of March 19, 1954, adjusted the contract price to allow a unit price of $1,369.82 for the changed units. (Finding 22). This was a higher unit price than the contract price of the electric units.

The Armed Services Board of Contract Appeals, after timely appeal and hearing on this and the other claims of plaintiff embraced in this suit, adjusted the unit price of the changed units to $1,763.94 which represents plaintiff's cost ($1,603.58) plus 10 percent profit for producing each of the changed units. (Finding 23).

In this suit, plaintiff asserts that (a) the substitution of electric units for gasoline units is outside the scope of the Changes article of the contract, that defendant's action in making the change was therefore a breach of contract, and that the measure of damages is the reasonable value of the end product; and

---

4. The formal change order was issued on October 9, 1953.

(b) even if the change order is valid, plaintiff is entitled to a higher allowance of unit cost than the cost allowed by the Board. Plaintiff claims that under either theory it is entitled to a unit price of $1,919.51 on the change units.

 Defendant asserts that the formula used by the Armed Services Board of Contract Appeals was legally erroneous and that under its counterclaim defendant is entitled, as a matter of law, to a downward equitable adjustment of the original contract price. Defendant's position is that the change was within the contract and, since the change was from an item of greater value (gasoline driven units with a production cost value of $1,868.80) to an item of lesser value (electric driven units with a production cost value of $1,603.58), there should be a reduction in the unit contract price of the difference in cost between the two, or $265.22; and that the unit price for the change units should have been $1,720 (contract price of gasoline units) less $265.22, or $1,454.78. If defendant is correct, it is entitled to recover on its counterclaim the difference in adjusted unit price allowed by the Board ($1,763.94) and the unit price which defendant claims is proper ($1,454.78) or $309.16 per unit, making a total for the 100 changed units of $30,916.

If the question presented involves a breach of contract it would, of course, be outside the operative effect of the Disputes article of the contract and, hence, the court in resolving the question would not be subject to the strictures of *Bianchi*. Likewise, if the question presented involves the legal sufficiency of a formula used in determining damages the court would make its determination independently of the action of the administrative Board. (See cases cited under claims (1) and (2), supra.)

The Changes article of the contract provided:

2. CHANGES

The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change: *Provided, however,* That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled 'Disputes.' However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.

The formal change order which was issued on October 9, 1953, provided:

1. Pursuant to the authority contained in General Provision 2 titled 'Changes' of Contract DA 11–009–QM–19174 entered into under date of 6 June 1952 between the United States of America and Keco Industries, Inc., the provisions of said contract as heretofore modified by Supplemental Agreement No. 1 are further amended as follows:

For Item 3, 100 each Refrigeration Units Gasoline Engine Driven shall be converted to Refrigeration Units Electric Motor Driven in accordance with Military Specification MIL–R–11676 (QMC), dated 4 January 1952.

2. By reason of these changes, the nomenclature of Item No. 3 is amended, as follows:

Refrigeration Unit (For Refrigerated Warehouses), vertically mounted, Electric Motor Driven 220 Volts, 3 phase, 60 Cycles AC in accordance with Military Specification MIL–R–11676 (QMC), dated 4 January 1952 and exceptions as indicated in the Schedule (Stock No. 66–R–292–550).

3. By reason of these changes, Items Nos. 3a and 3b are deleted.

4. By reason of these changes, the provisions prescribing the compensation to be paid under said contract including the Guaranteed Shipping Weight and the provisions relating to delivery shall be subject to an equitable adjustment and if the parties fail to agree with respect thereto, such failure shall be treated as a dispute within the meaning of General Provision 12 of the contract, titled 'Disputes'.

5. Except as hereby amended, all of the terms and conditions of the said contract shall remain unmodified and in full force and effect and shall also apply in carrying out the provisions of this Order.

Plaintiff contends that because of differences between gasoline and electric driven units the change order was invalid and that the attempted change from gasoline to electric driven units constituted a breach of contract. Plaintiff produced testimony before the Board on certain differences between the two types of refrigerators, but the evidence establishes that the only essential or significant difference was in the power units which plaintiff purchased fully assembled. The overall dimensions of the two types of refrigerators and most basic parts were the same.

Since the right to make changes was reserved to defendant, it cannot be liable for breach of contract for its exercise of that right, unless the changes were cardinal changes and exceeded the discretion which the Changes article vested in the contracting officer. See Aragona Construction Company, Inc. v. United States, 165 Ct.Cl. 382 (1964).

The reported decisions do not establish clear lines of demarcation between changes which may be said to come properly within the Changes article of Government contracts and cardinal changes which constitute breaches of contract. Certain guide lines in the decided cases are, however, helpful in determining how a given change should be regarded. In Saddler v. United States, 287 F.2d 411, 413, 152 Ct.Cl. 557, 561 (1961), the court stated:

We think that a determination of the permissive degree of change can only be reached by considering the totality of the change and this requires recourse to its magnitude as well as its quality.

The court held that the change which required a 100 percent increase in the amount of earth to be moved was a cardinal change constituting a breach of the contract. In arriving at its conclusion the court considered the original tenor of the contract versus the contract as changed and found that the original purpose of the contract had been substantially changed.

In Aragona Construction Company, Inc., supra, at 390–391, the court stated:

In deciding whether a single change or a series of changes is a cardinal change and a breach of the contract, we must look to the work done in compliance with the change and ascertain whether it was essentially the same work as the parties bargained for when the contract was awarded. Plaintiff has no right to complain if the project it ultimately constructed was essentially the same as the one it contracted to construct.

* * * In contrast, the cases that have held the changes ordered by the contracting officer to be cardinal changes and, hence, not permitted under the contract, have involved changes

that altered the nature of the thing to be constructed. * * *

In the instant case, volume was not increased. No new item unknown to plaintiff was required. Plaintiff was geared to production of the electric driven units and had not produced any gasoline driven units and, as noted above, the two types of refrigerators were essentially the same except for the power units which plaintiff purchased fully assembled. It is concluded that the change from 100 gasoline to 100 electric driven refrigerators was not a cardinal change and, accordingly, that defendant did not breach the contract in issuing the change order.

We proceed then to the determination of the proper formula to be used in an equitable adjustment within the terms of the contract because of the change from the 100 gasoline driven units to the 100 electric driven units.

A paramount fact is that the deleted gasoline driven units, with a unit contract price of $1,720 and a unit production cost of $1,868.80 were of greater value than the substituted electric driven units, with a unit contract price of $1,271 and a unit production cost of $1,603.58. The unit contract price of the gasoline driven units exceeded the unit contract price of the electric driven units by $450 and the unit production cost of the gasoline driven units exceeded the unit production cost of the electric driven units by $265.22.

In support of its position plaintiff cites a number of cases, none of which has factual situations comparable to the instant case. In Tobin Quarries, Inc. v. United States, 84 F.Supp. 1021, 114 Ct. Cl. 286 (1949), cited by plaintiff, the contractor was obliged to perform certain work with a higher priced rock because the Government had mistakenly thought that cheaper rock was available. The court held that the contractor should not be penalized by a reduction in contract price because the cheaper rock was not in fact available. Other cases cited by plaintiff on this issue involve either

actions by the Government outside the scope of the contract or are otherwise so different in facts as to be inapplicable.

Defendant places its reliance on this issue exclusively on S. N. Nielsen Co. v. United States, 141 Ct.Cl. 793 (1958), in which the contractor entered into a Government contract based on a grossly improvident bid to perform certain construction work. The value of a segment of the work (outside utilities), based upon what it would have cost the contractor to do it, plus overhead and profit would have been $60,690, but the contractor mistakenly estimated $34,800 in making its bid for this work. A few days after the contract was entered into, the contracting officer advised the contractor of a proposed change eliminating certain type construction and substituting less expensive construction in the outside utilities. The contracting officer requested the contractor to submit a credit proposal for the labor and materials involved in the change. Thereafter, the contracting officer issued a formal change order, which the contractor accepted by endorsement, and which stated that an equitable adjustment under the terms of the Changes article of the contract would be determined at a later date. Whereupon, the contractor performed the work in accordance with the change order. The cost of the work as changed was $19,180. This left a difference of $41,510 between the value of the work as originally contracted for ($60,690) and the value of the work as changed. The contractor proposed to credit the Government with $18,000. The contracting officer determined that the equitable adjustment should be the $41,510 and the contract payment to the contractor was reduced by that amount. After the Armed Services Board of Contract Appeals had affirmed the contracting officer's decision the contractor brought suit in this court. The opinion of the court reads in part at 796–797:

The plaintiff points to its losses under the outside utilities electrical por-

tions of its contract. However, its losses would have been the same if the change order had not been issued, since it finds no fault with the contracting officer's figures as to the costs as they would have been without the change order and the costs as they were under the change order. The plaintiff suggests that the change order was not permissible under the contract. If that were true it would be immaterial since, as appears above, the change order did not increase the plaintiff's losses. In any event, the change was 'within the scope of the contract' and was accepted by the plaintiff. The only dispute was in regard to the amount of the equitable adjustment.

The plaintiff says that, of the mistakenly small amount of $34,800 which it estimated for all of the outside electrical work in making its bid, only $22,564.32 was properly applicable to the line from the Alert Hangar to manhole No. 2. It says that the $19,180 actual cost of the changed work should have been subtracted from the $22,564.32, and only the difference of $3,384.32 should have been deducted from the plaintiff's contract price. We think the $22,564.32 figure is of no significance. It is only an allocation of a proportionate part of a larger sum which was itself grossly inadequate because of the mistake in the bid. The plaintiff's attempt to use it is only another way of seeking reformation of the contract on account of its unilateral mistake in making the contract. As we have seen, the plaintiff disclaims, rightly we suppose, any entitlement to a direct reformation of the contract on account of the mistake. We think it is not entitled to use its mistaken estimated figures, which have no relation to actual costs, in determining the equitable adjustment.

The plaintiff's petition will be dismissed.

More recently, in Bruce Constr. Corp. v. United States, 324 F.2d 516, 163 Ct. Cl. 97 (1963), the court made pronouncements on the purpose of an equitable adjustment which give further guidance in resolving the question of an equitable adjustment in the instant case. Both the basic facts and pertinent segments of the court's views are contained in the following excerpt from Bruce Constr. Corp. v. United States, supra, 324 F.2d at 517, 163 Ct.Cl. at 100:

Though the price which plaintiffs actually paid for the 'sand block' was the same as they would have paid for the original block selected, they contend that the fair market value of the sand block was greater than the purchase price. Essentially then, plaintiffs argue that defendant should not benefit from the bargain price plaintiffs secured from their supplier, but should pay for the actual value of the sand block received by defendant, not merely its actual cost.

Though there is substantial controversy as to the market value of the sand block as of the time of the transaction between plaintiffs and their supplier, for purposes of defendant's motion for partial summary judgment, we are called upon only to decide the narrow question whether 'cost' or 'fair market value' controls in the award of an equitable adjustment.

Equitable adjustments in this context are simply corrective measures utilized to keep a contractor whole when the Government modifies a contract. Since the purpose underlying such adjustments is to safeguard the contractor against increased costs engendered by the modification, it appears patent that the measure of damages cannot be the value received by the Government, but must be more closely related to and contingent upon the altered position in which the contractor finds himself by reason of the modification. * * *

In *Nielsen*, the court points out that "the change did not increase plaintiff's

losses." In *Bruce Construction,* the court notes that "the underlying purpose of such adjustments is to safeguard the contractor against increased costs engendered by the modification." In the instant case, if there had been no change order plaintiff would have lost $148.80 per unit in manufacturing the gasoline driven units ($1,868.80, cost, less $1,720 contract price). If the unit price because of the change order is reduced by $265.22, the difference between production cost of the electric and the gasoline driven units with a resulting adjusted unit price for the changed units of $1,454.78, then plaintiff's loss because of the change order would be $148.80 ($1,603.58, cost, less $1,454.78) which is the same unit loss which plaintiff would have had if there had been no change order. In other words, in the formula which defendant advocates under its counterclaim, the change would not, in the *Nielsen* language, increase plaintiff's losses; nor would the change, in *Bruce Construction* language, cause increased costs engendered by the modification. It is concluded that the formula proposed by defendant for the equitable adjustment is correct under the principles announced in *Nielsen* and *Bruce Construction.*

 It is accordingly concluded that the adjusted unit contract price of the 100 changed units should be $1,-454.78 which represents the contract price of the gasoline driven units ($1,-720) less $265.22 which is the difference between the production cost of the two type units, and that defendant should be allowed to recover on its counterclaim the difference in adjusted unit price allowed by the Board ($1,763.94) and the unit price of $1,454.78 or $309.16 per unit, making a total recovery on the counterclaim of $30,916.

In summary, it is recommended that judgment be entered on defendant's counterclaim for $30,916 less $1,085.40, being the amount found due plaintiff on its claim (1) for spare parts and tools, or $29,830.60.