Per Curiam :
This case was referred to Trial Commissioner Diehard Arens with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on September 15, 1966. Plaintiff filed exceptions to the commissioner’s findings and recommendation for conclusions of law, and the defendant moved that the court adopt the commissioner’s opinion, findings of fact and recommendation for conclusion of law. The case has been submitted to the court on the briefs of the parties and oral argument of counsel. Since the court agrees with the commissioner’s findings, opinion and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is, therefore, not entitled to recover and the petition is dismissed.
OPINION OE COMMISSIONER*
Arens, Commissioner:
This case arises out of a contract which was awarded on January 2, 1959, by the Department *283 of the Army to plaintiff as low bidder for the strengthening of runway access taxiways and the construction of overruns and threshold lighting at Fairchild Air Force Base, Washington. Plaintiff asserts that the decisions of the Armed Services Board of Contracts Appeals denying plaintiff’s appeals from two adverse decisions of the contracting officer on claims which were made under the disputes clause of the contract, are arbitrary and capricious, not supported by substantial evidence and are based upon erroneous conclusions of law. The sole evidence before the court is the administrative record which includes the transcript of the ASBCA hearings and numerous exhibits in the two appeals. The amount of recovery, if any, is reserved under Buie 47 (c).

First Glaim

Payment for Behandling Stockpiles
The contract provided that the work was to be completed in consecutive order in six numbered work areas shown on the drawings. In schedules in the Invitation for Bids, under Items 6A, 6B and 6C “Excavation, common” it was estimated that there would be a total of 230,000 cubic yards excavated for which plaintiff bid a unit price of 50 cents per cubic yard.
Other pertinent provisions of the contract are as follows:
TP 2-03. EXCAVATION. — a.—General—Excavation of every description and of whatever substances encountered within the work limits shown shall be performed to the lines and grades indicated on the drawings. Excavated material meeting the requirements herein for backfill material shall be transported to and placed in the backfill areas within the limits of the work shown on the drawings. All materials excavated and the materials used in backfilling shall be included in and will be paid for as excavation. * * * During construction, excavation and backfilling shall be performed in a manner and sequence that will provide drainage at all times. * * * Excavations encountering ground water shall be kept drained by pumping. Subgrade material and excavated materials not meeting requirements herein for backfill, and excess excavated material, shall be placed in waste disposal areas shown on the drawings or outside the limits of the Government property. Such disposal shall be the Contractor’s responsibility and at the Contractor’s expense. If equipment being used for *284 excavation displaces subgrade materials, which, in the opinion of the Contracting Officer are otherwise satisfactory, the Contractor shall use lighter equipment which does not displace the subgrade. In addition, the routing of construction equipment during excavation shall be well distributed to prevent pumping or shearing of the subgrade.
b. Additional Subgrade Excavation. — * * * The Contractor shall stockpile excavated base and subbase materials, as directed by the Contracting Officer, for use in backfill.
TP 2-04. BACKFILL. — * * * All excavated materials meeting the specification requirements for back-fill material shall be placed directly as backfill or stock piled until such time as backfill operations are completed in the particular work area. Material may be stock piled adjacent to the work area until work in that particular area is completed. Upon completion of work in any work area, all remaining stock piled material shall be moved to next work area or to stock piles in the vicinity of either end of project as designated by the Contracting Officer. Stock piled material not utilized shall be disposed of in the waste disposal areas shown.
SECTION 17 — MEASUREMENT AND PAYMENT
TP 17-01. GENERAL. — The contract price for each item shall constitute full compensation for furnishing all plant, labor, materials, equipment, and incidentals, other than Government-furnished materials and equipment, and performing all operations necessary to construct and complete the items in accordance with these specifications and the applicable drawings. Payment for each item shall be considered as full compensation, notwithstanding that minor features may not be mentioned herein. Work paid for under one item will not be paid for under any other item. Salvage value of material that becomes the property of the Contractor shall be considered as part compensation and/or remuneration for the work.
TP 17-02. — MEASUREMENT.—Measurement of the units of work shall be made as hereinafter specified.
a. * * *
b. Oubio Yard Measurement. — (1) Excavation will be measured in the original position in the excavation area by cross sections taken before and after excavation of the material. Volumes shall be computed by the average-end-area method. The measurement will not include material excavated without authorization beyond the lines and grades shown on the drawings. *285 Excavation for structures will not be included in the measurement for grading.
TP 17-03. PAYMENT. — a. * * * c. Excavation, Common. — Payment will be made at the contract unit prices for Items 6A, 6B and 6C, payment of which shall constitute full compensation for excavation in connection with grading including stockpiling topsoil or hauling topsoil directly to areas of application; additional subgrade excavation; removal of existing base course materials; utilizing excavated material in backfills, including incidental stockpiling, compaction and the addition of moisture for compaction; and for the disposal of waste material, including wasting of any surplus stockpiled excavation. Excavation for utilities and structures below the surface of the compacted select fill will be paid for under other items as specified.
During the performance of the excavation portion of the work, plaintiff was required by the Government inspectors to stockpile in areas adjacent to the work areas 63,578 cubic yards of excavated material which was suitable for backfill but which could not be immediately used as such because of intervening work in removing material below subgrade. Thereafter, plaintiff was generally required to use the stockpiled material as backfill. In some instances, however, plaintiff was required to move the remaining stockpile of one area to a place alongside the next area, to be available in case of need. The leftover was then moved by plaintiff to a waste area. Plaintiff claims that it is entitled under the above quoted provisions of the contract to payment for the rehandling of the stockpiled material at the rate of 50 cents per cubic yard, and that it so construed the contract provisions when it formulated its bid after it physically examined the work site.
As above indicated, in the schedules in the Invitation for Bids, it was estimated that there would be 230,000 cubic yards of common excavation. Plaintiff was paid for actual excavation of 262,000 cubic yards. This included all materials excavated, whether unsuitable for backfill and disposed of as waste or suitable for backfill and so used directly upon excavation, or subsequently used as backfill from the stockpiled material or wasted.
*286 Plaintiff argues, in essence, that it construed tbe payment provisions of the contract to provide a unit price of 50 cents per cubic yard for all excavation including “excavation” from the stockpiles, that such construction is reasonable, and that under the principles of Peter Kiewit Sons’ Co. v. United States, 109 Ct. Cl. 390 (1947) and similar cases, relating to ambiguous provisions of Government drawn contracts, it is entitled to recover.
In its opinion the ASBCA stated:[1]
* * * In preparing appellant’s bid its secretary-treasurer and president had thus concluded that stockpiling of excavated backfill material and its rehandling could be avoided. The secretary-treasurer testified that appellant expected at most incidental stockpiling, which he defined as placing fill material immediately next to a site being worked on and not quite ready for backfill as against stockpiling alongside each work area, some distance from the spot where the actual work was being performed. Appellant’s secretary-treasurer further testified that he was confirmed in his plan by consideration of the test holes and pertinent data shown on Drawing No. 86-04-67 (Sheet 3 of 25). Apparently, he figured that these data could be read as locating accurately those segments of each work area where unsuitable material would be found and backfill required and that they revealed a kind of checkerboard pattern making the planned modus operandi a reasonable enterprise. * * * Despondent’s witness, its construction engineer and chief inspector, pointed out that the test holes, being so far apart, did obviously not represent accurately and in every detail the nature of the material to be encountered, that exact quantities of excavation could not be calculated therefrom, and that the mass diagram being based on such calculations, represented only approximate quantities of overall excavation, suitable backfill material to be excavated and backfill needed to replace unsuitable material. It was by reason of this uncertainty that the stockpiling requirement of paragraph 2-04 of the technical specifications was inserted into the contract. As to the alleged inaccuracy of the test hole data, respondent’s witnesses testified, that the borings were taken some time prior to the letting of appellant’s contract, and that the water table at Fairchild Air Force Base varies from time to time so that material which may show as silty sand suitable for backfill may later *287 turn out to have become water-logged and unsuitable. That this condition might be encountered by appellant is indicated clearly in paragraph 2-03a. of the technical specifications, which refers to the presence of excessive moisture from seasonal perched water tables.
The recitals contained in the foregoing excerpts from the Board’s opinion are amply sustained by the record. River Constr. Corp. v. United States, 159 Ct. Cl. 254 (1962).
The question presented, namely, interpretation of the contract is, of course, a question of law concerning which this court makes an independent determination. Morrison-Knudsen Co. v. United States, 170 Ct. Cl. 757, 345 F. 2d 833 (1965). It is axiomatic in the law that a contract is to be read from its four corners. Keco Industries v. United States, 176 Ct. Cl. 983, 364 F. 2d 838 (1966), cert. denied, 386 U.S. 958 (1967). Throughout the above quoted contract provisions the term “excavation” obviously refers to the digging out from the ground in the work areas and does not include a digging out or removal of material which has been excavated from the work area and temporarily stockpiled adjacent to the work area.
Section 17 of the contract, regarding measurement and payment, provides that “the contract price for each item shall constitute sole compensation for * * * performing all operations necessary to construct and keep the items in accordance with these specifications and the applicable drawings.” The section further provides that payment for each item shall be considered as full compensation, notwithstanding that minor features may not be mentioned, and that work paid for under one item will not be paid for under any other item. The “item” in this instance is common excavation, and under TP 17-03 (quoted above) payment for which “shall constitute full compensation for excavation in connection with grading including stockpiling topsoil or hauling topsoil directly to areas of application; * * *” and “utilizing excavated material in backfills, including incidental stockpiling, * * * and * * * disposal of waste material including wasting of any surplus stockpiled excavation.” Although the foregoing language could perhaps have been more clearly or artfully worded, there is no separate item which could reasonably be construed as embracing the “excavation” *288 of material in the stockpiles. There is no question, moreover, but that the contract required the stockpiling of the excavated material and the utilization of stockpiled material as backfill and/or its removal to the next work area or to a waste disposal area. It is concluded that there is no such uncertainty regarding the meaning of the contract provisions regarding payment for “excavation” as to form a proper basis for the construction urged by plaintiff. Southern Constr. Co. v. United States, 176 Ct. Cl. 1339, 364 F. 2d 439 (1966); Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 351 F. 2d 972 (1965); Jack Stone Co. v. United States, 170 Ct. Cl. 281, 344 F. 2d 370 (1965).
Plaintiff’s First Claim must therefore be denied.

Second Olaim

Concrete Aggregate
The contract required the paving of the runway access taxiway with Portland cement concrete, one of the essential ingredients of which was coarse aggregate. The contract described two sources of aggregate as “Approved Aggregate Sources,” the first of which (South % of Section 26) was closer to the project than the second approved source, but was controlled by the Morrison-Knudsen Company, a competing contractor and was, therefore, unavailable to plaintiff. The second approved source, Spokane River gravels, was a material commercially produced about 20 miles from the construction site. When plaintiff received the Invitation for Bids, its executives determined that they could submit a lower bid if they could find an aggregate source less expensive than Spokane River gravels. They accordingly located and acquired a source of coarse aggregate which was the same geological source as the South yz of Section 26 and was in close proximity thereto. They then prepared plaintiff’s low bid on the basis of using aggregate from the newly acquired source.
Plaintiff’s position is in essence that its aggregate source contained a sufficient quantity of coarse aggregate fully meeting all requirements of the contract; that defendant failed to supervise properly the sampling of plaintiff’s aggregates; *289 that defendant improperly refused to approve plaintiff’s source; that defendant failed to design proper concrete mixtures pursuant to the contract; and that plaintiff was required to use higher cost commercial and quarry aggregates, and thus incurred additional expenses for which it sought reimbursement.
In the extensive hearings before the ASBCA, the testimony of expert witnesses for plaintiff differed from the testimony of the expert witnesses for defendant respecting the nature of the aggregate from plaintiff’s source and the character of and reasons for the concrete mixtures which defendant designed. In a detailed and lengthy opinion [2] the ASBCA, after narrating the facts and reciting its interpretations of the contractual provisions in dispute, denied plaintiff’s appeal.[3] As previously indicated (in connection with plaintiff’s First Claim) the function of this court in this case is to determine whether the challenged findings of the ASBCA are supported by substantial evidence and to make an independent determination of the questions of law presented. Only those facts and contractual provisions are recited herein which are essential to the fulfillment of that function.
The contract provided in Special Condition 28 that concrete aggregate might be furnished from any of the approved sources, “or from any other source proposed by the Contractor and approved by the Contracting Officer.” Special Condition 28 further provided:
* * * The sources listed shall not be construed to preclude the use of other sources from which aggregate meeting requirements of these specifications can be obtained. The Contractor will designate in writing the source or sources from which he will furnish the aggregate. If the fine aggregate and coarse aggregate are not to be furnished from the same source, the Contractor will supply coarse aggregate from one source only and fine aggregate from one source only, unless otherwise approved by the Contracting Officer. If the Contractor proposes to furnish aggregate from a source or from sources not already approved, he may designate only one *290 source for both, coarse and fine aggregate or one source for each. Samples for testing shall be provided as required by Section, PORTLAND CEMENT CONCRETE PAVEMENT. Approval of a source of concrete aggregate is not to be construed as approval of all material from that source. The right is reserved to reject materials from certain localized areas, zones, strata, or channels, when such materials are unsuitable for concrete aggregate as determined by the Contracting Officer. Materials produced from an approved source shall meet all of the requirements of Section, PORTLAND CEMENT CONCRETE PAVEMENT, of these specifications.
Since plaintiff’s source of concrete aggregate was not one of the two sources described in the contract as approved, plaintiff requested approval of its source and informed defendant’s resident engineer that test holes were open for his inspection and observation during the loading of the test samples. It is not disputed that the original sampling was improperly performed, chiefly because the test holes were too shallow, and because the sample material was taken from only one test hole, with the result that the original sample material was rejected by defendant and plaintiff’s source was disapproved. At the time of the original sampling, defendant’s agents were present and “discussed” with plaintiff’s superintendent opening the pit more before the sampling, but plaintiff’s superintendent stated that he had been instructed by plaintiff “to take a sample out of the pit as it was,” and did so accordingly.
Plaintiff contends that the obligation for the sampling was upon defendant, and that the ASBCA erred in its opinion in not so holding. Plaintiff cites the following contract provisions which allegedly sustain its contention :
TP 8-06. SAMPLING AND TESTING OF MATERIALS * • *
c. Aggregates. — (1) Evaluation of sources. — * * * Suitable samples for quality evaluation from a source not previously approved shall be taken under the supervision of the Contracting Officer in accordance with Corps of Engineers Specification CRD-C 100 and shall be delivered by the Contractor to North Pacific Division Laboratory, Troutdale, Oregon, within 15 days after date of receipt of notice to proceed.
*291 Corps of Engineers Specification CRD-C 100 provides in part:
Basic Procedure
2. (a) Supervision. — 'Samples submitted for tests to provide data ror acceptance or rejection of the source of supply shall be taken under the supervision of a competent inspector or geologist. It is to the best interests of all concerned that the sampler be trained and experienced in his work. He should be conversant with the problems of aggregate production and processing. His knowledge of testing should be sufficient to assure his securing the samples which testing procedure requires. Finally, he should be familiar with construction practices so that he will place the proper emphasis on the sampling of materials.
(b) Representative Samples. — The importance of obtaining representative samples cannot be emphasized too strongly since failure to do so can provide inaccurate and misleading information even though the tests themselves are conducted properly.
Part I; Sampling Concrete Aggregate Sources
# * * H« H«
Sampling Pit-run (unprocessed) Sand and Gravel Deposits
4. Samples should be representative of the materials that might be produced from the site. They should include only materials taken below the bottom of the waste zone, overburden, or strip zone. If the deposit is worked as an open bank or pit, the sample shall be taken by channeling the face so that it will represent material that visual inspection indicates may be used. Care should be taken to exclude material that has fallen from the face. A sufficient number of test pits and trenches should be opened to insure that samples are representative of those that might be produced. Separate samples should be obtained from the face of the bank and from test pits or trenches; and, if visual inspection indicates that there is considerable variation in the material, separate samples shall be obtained at different depths. The sample should not include materials of sizes larger than those specified for use in the project for which the deposit is being considered unless it is proposed that such oversize material be crushed and combined with smaller sizes for use.
*292 Pertinent findings of the ASBCA regarding the sampling from plaintiff’s source are as follows:
The sample was dug from the bottom and sides of the test pit, which was between 12 and 15 feet deep, and loaded into a truck. The sample was as representative as could have been gotten from a pit as shallow as the test pit was, but appellant wanted to get samples on that day and with the equipment available. Hence, though the Government observers present suggested better methods to obtain a more suitable sample, appellant’s superintendent proceeded as described above, stating that he was instructed by appellant to take a sample from the pit as it was. Although several test holes were available, appellant’s superintendent took samples only from one. * * *
* * # * *
Nevertheless, it is understandable that based on these facts appellant hoped to be able to produce from its own source pit-run aggregate meeting contract requirements. But the record also shows why such hopes might be disappointing. For appellant on its first try was unable even to obtain a representative sample of the material found in its source. The reason for this was that appellant, though presumably familiar with the applicable sampling manual CitD-lOO, did not follow the manual, did not properly superintend the taking of the sample and restricted its superintendent to a sampling method selected by it, even though the Government representatives present pointed out to him its inadequacy. We have on this point only the testimony of respondent’s representatives but it persuades us to find that they performed the supervisory function cast upon them by section 8-06c.(1) of tlie technical specification; they watched and observed and tried to correct error in method. They were firmly rebuffed and let appellant proceed as it desired. This course of the events in no way relieves appellant of the duty to take samples in accordance with CRD-100, a duty cast on him both by paragraph 8-06 and by article SC-28 as a condition for qualifying its new aggregate source.
It is clear that the “sampler,” referred to in Corps of Engineers Specification CRJD-C 100 is the representative of the contractor and not the contracting officer, under whose supervision the sample was to be taken. The ASBCA found, moreover, that the representatives of the contracting officer *293 “performed the supervisory function cast upon them” and this finding is supported by substantial evidence. It is, therefore, concluded that the improper original sampling was the fault of plaintiff and not of defendant.
Subsequent to the rejection by defendant of plaintiff’s original sample, new samples were submitted by plaintiff and were incorporated into several design mixes which passed various prescribed tests, such as the freeze-thaw, soundness and abrasion tests. Plaintiff contends that the rejection by the contracting officer of certain sample material on the ground that it contained excessive soft particles and weathered material, was improper, and that the ASBCA erred in not so finding.
Paragraph 8-05 of the contract specifications reads in part:
8-05. MATERIALS. — a. Aggregate, Coarse. — (1) Composition. — Coarse aggregate shall consist of gravel, crushed gravel, crushed stone, or a combination thereof.
(2) Quality. — Aggregates as delivered to the mixers shall consist of clean, hard, unweathered and un-coated particles. Dust and other coatings shall be removed from the coarse aggregates by adequate washing.
$ $ H* ‡ ‡
(5) Deleterious materials in the coarse aggregate shall not exceed the following limits:

Material Percentage ty weight

* * * # *
Soft particles_ 2. 0
Plaintiff contends that the terms “unweathered” and “soft particles” are relative terms; that there are no specific tests set forth in the contract by which to determine or measure weathering or soft particles; that the several specified tests which the sample material did pass would disqualify aggregate which was weathered or so soft that it would not be acceptable under the contract; and that the “deleterious materials” are only those which would be determined by the various tests specified in the contract. The ASBCA opinion, pertinent to this issue reads:
Appellant argues, therefore, that material passing the abrasion and soundness tests should be deemed to be un-weathered and to meet the soft particles requirement.
*294 We cannot accept this view. The specification set forth each of the mentioned qualities as a separate requirement which coarse aggregate must meet. Moreover, one of appellant’s expert witnesses conceded that hard material, though weathered, may pass soundness and abrasion tests. As to the requirement that coarse aggregate be unweathered, it is difficult to believe that samples showing 15.8 to 22.2% extremely weathered particles can be described as unweathered.* As to soft particles the evidence establishes that scratching with a brass rod is the commonly used test method. Application of this test showed soft particles well in excess of 2% even though the samples passed soundness, abrasion and freeze-and-thaw tests. The attacks made by appellant on the accuracy of these tests carried out by and under a qualified petrographer at the Troutdale laboratory are not convincing. Nor was appellant entitled to a waiver of this requirement since the waiver provision of paragraph 8-05a. and b., cited by it, applied only to the soundness test and in any event, the waiver thereof was discretionary with the Government. The conclusion is unavoidable that the sample material submitted to Troutdale prior to 30 June 1959 (including the sample from which mix design No. 10,093 was made) did not qualify within the soft particle limitation of paragraph 8.05 and was not unweathered material, granting that no aggregate is literally without any weathering.
The foregoing findings by the ASBCA are supported by substantial evidence. Plaintiff has not established that the test used by defendant relating to weathering or soft particles was improperly conducted or that the test results were wrong. It is clear, moreover, that the tests enumerated in the specifications did not preclude other tests relating to other requirements, including requirements that the material be un-weathered and not contain in excess of 2% soft particles.
The contract provided that the concrete mixtures were to be designed by the contracting officer (in practice, the Trout-dale laboratory) using approved materials as furnished by plaintiff, and that the mixtures were to be designed to produce concrete having an average flexural strength of 750 pounds per square inch at 90 days of age. Plaintiff’s experts and defendant’s experts differed sharply both at the time of *295 the tests for flexural strength and in extensive testimony before the ASBCA respecting the adequacy of the concrete mix designs, principally with respect to water-cement ratios. The opinion of the ASBCA pertinent to this issue reads:
Passing to compliance with the flexural strength requirement of paragraph 8-04 of the technical specifications, Troutdale cannot be said, in the light of the testimony on the 1955 M.K. mix designs and of all of the data and information on the effect of water-cement ratios on flexural strength, to have designed improper concrete test mixes. The record supports the view that with the material at hand a water-cement ratio somewhat above A was not excessive. * * *
From a reading of the entire record in the case, pertinent to the issue of concrete mixtures, it cannot be said that the foregoing finding of the ASBCA is, under the Wunderlich standards, not supported by substantial evidence.
Finally, plaintiff contends that since, as heretofore stated, plaintiff’s aggregate was from the same geological source as one of the “Approved Aggregate Sources” described in the contract, defendant in effect furnished a sample and represented that such aggregate would meet the specifications of the contract, and that therefore the various failures of the materials furnished were the result of defective specifications. Plaintiff cites several cases in which occurred defective contract specifications and/or Government misrepresentation, but these eases are inapposite because in the instant case the contract provided that while aggregate could be furnished from any approved source, “approval of a source of concrete aggregate is not to be construed as approval of all material from that source,” and that “Material produced from an approved source shall meet all of the requirements of Section, Portland Cement Concrete Pavement, of these specifications.” The ASBCA found, moreover, and the evidence supports the finding, that while plaintiff’s aggregate source and an approved source had the same formative history and material found in each was on the whole similar and of comparable quality, there were significant differences. The ASBCA noted, for example, the testimony of expert witnesses who stated that the approved source yielded “coarser materials more suitable to producing unweathered aggregate free of *296 soft particles and yielding required flexural strength in concrete produced therefrom.”
Plaintiff’s Second Claim must also be denied.
CONCLUSION OP LAW
Upon the foregoing opinion which includes therein the findings of fact and which is adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover. The petition is therefore dismissed.

The opinion and recommended conclusion of law are submitted pursuant to order of tbe court under Rule 57(a). The facts are stated in the opinion.

 ASBCA No. 9348 dated August 12, 1964.

 ASBCA No. 9561 dated September 29, 1964.

 By stipulation of the parties only the question of liability or entitlement was submitted to the ASBCA, with the issue of damages reserved for negotiation or further proceedings.

In the April sample the %" to 1%" aggregate had only 11.2'' [%] extremely weathered particles but the smaller coarse aggregate registered a record high of 22.2%.