**S. S. MULLEN, INC.**

v.

**The UNITED STATES.**

**No. 98–65.**

United States Court of Claims.

Jan. 19, 1968.

Paul R. Cressman, Seattle, Wash., attorney of record for plaintiff. John C. Hoover, Seattle, Wash., of counsel.

Edwin J. Reis, Washington, D. C. with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

NICHOLS, Judge.*

This action is brought to obtain an "equitable adjustment" of a contract price under circumstances that will be stated, or in the alternative to recover for breach. The contract was let in 1960 and called for the erection of new aerial tramways at Lisburne and Tin City, both in Alaska. The contractor pursued its remedy under the Disputes Article before the Armed Services Board of Contract Appeals. The result was unfavorable to it. Appeal of S. S. Mullen, Inc.,

ASBCA No. 8583, 65–1 BCA ¶ 4644. The contractor assigns various errors. Our review is subject to the provisions of the Wunderlich Act (41 U.S.C. 321, 322, 68 Stat. 81) by which the Board's findings of fact are final if supported by substantial evidence. Certain key findings we hold, are not so supported, and the Board has also made important errors of law. We hold that plaintiff should receive an equitable adjustment.

The dispute relates to the Tin City tramway only.

In 1951 the Corps of Engineers built an earlier aerial tramway of the so-called "Columbia" type connecting the base camp there with a radome on a hilltop 7,170 feet distant and 1,894 feet high. The tramway was supported on ten steel towers, counting those at the terminals, and was of the single track cable type. A car was pulled up and down the track cable by traction cables. The Air Force operated this installation as an auxiliary to the radome, to transport personnel, supplies, and material, including the radome's water supply. It had a rated load capacity of 6,000 pounds. The terrain is rugged, though a crude road leads up to the radome. The location is on the Bering Sea, near its northern exit at Bering Strait. The Air Force operates other similar tramways in the area; one involved in the same contract, as will appear, at Lisburne, Alaska, further north, but paradoxically, in a more clement climate.

One evil pre-eminence of Tin City is with respect to its ice storms. That destructive meterological phenomenon is familiar in milder shape to most residents of the continental United States: water in liquid form is carried through air, is deposited on trees, electric wires, and car windshields, and then adheres and freezes before it can evaporate or run off. The Tin City ice storms owe their unique malevolence to a combina-

* At the direction of the court, Trial Commissioner C. Murray Bernhardt prepared an opinion which has been of substantial assistance to the court. We reach the same result by a somewhat different route. The case having come before us on the administrative record, no evidence was taken *de novo*. Our fact findings are set forth in the opinion.

tion of the damp Bering Sea climate and the winds which commonly attain a velocity of 100 mph. The 1951 Columbia type tramway proved ill adapted to such ice storms. The track cable would collect masses of solid ice up to a thickness of 16 to 24 inches, setting up stresses not provided for in the design. The great distance between towers may be noted, e. g., 961 feet between 7 and 8. (They were numbered starting with 1 at the bottom). The high winds would accentuate the strain, blowing the cables sideways and at times jumping them partly out of the saddles they passed through on each tower, setting up a severe local shearing. The originally installed track cable broke from an ice-load in 1954 and a replacement, installed in 1955, broke in 1958 by the same cause. Apart from this fault and some teething troubles on first completion, the system apparently worked well and had no other defects important to this litigation.

In 1958 the Headquarters, Alaskan Air Command, issued a regulation governing the operation among others of its Columbia type tramways. Under the heading *"Purpose and scope"* it states: "Safety is a paramount consideration in tramway operation because of the potentially hazardous nature of this type of equipment. * * *" With respect to loads it said:

"f. The maximum load and passengers carried per trip will be as follows:

(1) *Columbia Tramways* (Single track)

(a) Maximum passengers—6 and 1 controller.

(b) [not applicable.]

(c) Maximum load with cab removed [the normal state], 3,800 pounds, including passenger weight."

This remained in effect throughout the period covered by this litigation. However, it was construed by Air Force Personnel at Tin City to limit the load carried to 3,800 pounds only when passengers were aboard the tramway. For loads of freight alone the full 6,000 pound rated capacity continued to be carried. And a sign aboard the car or in the terminal house stated that its capacity was 6,000 pounds. The principal cargo carried was water and, according to testimony, it was safer to fill the tank to the top and exceed 3,800 pounds than it would have been to go up in the 100 mile winds with a partly empty tank. Witnesses, obviously not in privity with the thinking of the Alaskan Air Command, were permitted to speculate on why the Command prescribed this 3,800 pound limitation and what it meant. This was plainly irrelevant and incompetent and we disregard it, though by its diversity it at least warns against jumping to conclusions. The record contains nothing else outside the document itself to warrant any inference whatever as to whether the Air Command thought that Tin City Tramway operations were unsafe or not with loads not including passengers over 3,800 pounds but within 6,-000. As to the document itself, having in mind the growing inability of Americans to say clearly what they mean in these decades of the 20th century, and the weight to be given to the practical construction of a document by those operating under it, see, e. g., Maxwell Dynamometer Co. v. United States, Ct.Cl. No. 120–62, 386 F.2d 855 decided November 9, 1967, and cases cited therein, we cannot say that the regulation prohibited Air Force personnel from operating the Tin City tram with crew and cargo up to 6,000 pounds, without passengers on board. Government counsel construed it before the Board as applying only to use with passengers. (R 151). That the Army Engineers never took it seriously is undisputed in the record before us.

We turn now to the award to plaintiff, which in the spring of 1960 bid to construct—and on June 30, 1960 was awarded a contract to construct—new tramways at Lisburne and Tin City, of the double-track Riblet type. The towers were to be lower, to keep the cables out of the maximum wind velocity, and

of a new ice-resistant design. At Tin City the axis of the new line was the same as the existing line. Plaintiff intended to install the concrete foundations with its own forces, and to subcontract the steel towers proper to West Coast Steel Works. The two would share in any judgment. For present purposes it seems sufficient to attribute any knowledge one had to the other, and unnecessary to distinguish between them at this stage of the litigation.

In short, then, plaintiff intended its subcontractor to fabricate and assemble the new towers in its Portland, Oregon, plant, to disassemble them into components not over 6,000 pounds in weight, to transport them north by barge in the spring of 1961, and in the short 1961 summer working season to use the existing tramway to transport the components of the new towers to their intended sites and reassemble them in and upon the concrete footings previously provided. Plaintiff knew at the time it bid, by uncontradicted testimony, that the rated capacity of the existing tramways was 6,000 pounds, although it did not get that information from the invitation to bid. Plaintiff did not know of the Air Force regulation, previously mentioned. Plaintiff made no site investigation in 1960 to determine for itself what use it might be able to make of the existing tramway. By uncontradicted evidence, use of the existing tramway as a "high-line" would have been far more economical and expeditious than moving the components by land, considering that the existing road gave access to the towers only up as far as tower 5. Plaintiff's cost estimates used in preparing its bid were predicated on use of the existing tramway to move 6,000 pound components and allowed no cushion for a possible necessity of resorting to costlier methods. The parties and the Board seem to have given no consideration to the foreseeable consequence, as regards tramway use, of reducing the tower components to 3,800 pounds. Counsel in oral argument before us said this would probably have necessitated too many trips of the tramway to have been possible in the short construction season possible in that climate.

The contract clauses that we consider germane to the dispute are set forth in the appendix. Briefly, it will suffice to say that it was provided: "The existing towers and tramway may be used in erecting the new towers and tramway," but the contractor had to "assume all liability." After the tramway was in Government hands in winter for "operation and maintenance," there was to be a "joint inspection" of the tramway befor it was turned over to the contractor for its use. In case Government furnished material set forth in the specifications (this included the tramway) was not "suitable for the intended use" the contracting officer was to make an "equitable adjustment" under the "Changes" article. We have recently held that this type of clause is in effect a warranty that the Government furnished material will be suitable for the intended use. Thompson Ramo Wooldridge Inc. v. United States, 361 F.2d 222, 226, 175 Ct.Cl. 527, 538 (1966).

And there was a standard "Site Investigation" article. As the contractor, so far as appears, made no actual site investigation with respect to its intended use of the existing tramway, the Board quite properly says it is bound by what it would have discovered if it had investigated. This would have been, it says, that the existing towers and tramway were not suitable to transport 6,000 pound components of the new tower "without considerable risk," and further:

> * * * it [contractor] would have discovered that the cable had failed several times in the past and that the using agency did not allow its personnel to use it to carry more than 3,800 pounds. * * *

Elsewhere in its findings the Board says the 3,800 pound limitation

> * * * does indicate that the using service [the Air Force] thought that 6,000 pounds was too much for the system.

With all respect, the record does not furnish substantial evidence of what the using service thought, except about use with passengers, not here relevant. If the Board deemed that the opinion of the Air Force had relevance, it should have asked the Air Force.

While the breaks in the cable, two, not "several", before 1960, are of record, it is also of record that they were due, not to cargo carried over 3,800 pounds, but ice of weight not exactly known, but supposed to have been several times that heavy. Thus the two breaks, had plaintiff known of them could not have warned it of any risk in supporting 6,000 pound components by tramway, and afforded no evidence "whether or not the tramway was adequate to use as it had intended."

It is apparent that plaintiff would have been answered in the affirmative if before contracting it had asked the Army Engineers whether the system could support 6,000 pound components. This was their position, as all the evidence shows, even after the 1959 cable had suffered an ice break in January 1961, and received a dubious repair, as described infra. It is not possible the repair could have strengthened the cable —the only question then was how much weaker it was. The Government at the trial offered no evidence to show that the system at the time of award was inadequate for plaintiff's plan. It scoffed at the Air Force regulation as proving the contrary. Its position before the Board was that except when ice breaks awaited repair, the system's actual capacity was 6,000 pounds at all times up to its final supersession.

There is therefore no substantial evidence to support the findings of the Board, quoted supra, and we find to the contrary: if plaintiff had made an adequate site investigation it would have discovered nothing to show that its plan to use the existing tramway to assemble the new towers at their intended sites was not safe and feasible.

Of course, plaintiff's work might have been interrupted and delayed by an ice break while it was going on, but this was least likely in summer, the intended working season. Whether plaintiff at the time of bidding might have expected what actually occurred, that a break in winter 1960–61 would interfere in its work the next summer, depends on what it might legally expect the Government to do to repair the break, which we discuss infra.

The work at Lisburne was done according to plaintiff's plan. A joint inspection took place in June 1961, and the parties agreed in writing that the tram then had a capacity of 6,000 pounds. No attention was paid by either side, apparently, to the Air Force regulation, quoted supra, though according to the Board's reasoning it applied to Lisburne equally with Tin City, and it should have given equal warning there that plaintiff's plan was unfeasible. Plaintiff proceeded to use the tram to assemble components of the new towers up to 6,000 pounds weight, without any untoward incident occurring.

At Tin City things went quite differently. The night of January 20–21, 1961, there had been a severe ice storm. According to routine, the tram had been secured at night. In the morning it was routine likewise for the operator to make a dry run to be sure the system was in good order, before moving any passengers or cargo. This time he found the system loaded with an enormous ice accumulation and on his breaking it off it appeared that the track cable was damaged in the vicinity of towers 7 and 8. The Air Force promptly imposed a limit of 1,000 pounds and three trips a week. The Board took a great deal of technical evidence as to the extent of damage. The Board's findings save us the necessity of exploring the details. Suffice it to say that at least in the vicinity of towers 7 and 8, the cable had been strained beyond its elastic limit, the damage there was irreparable, and how much confidence might be felt in the remainder was a matter of opinion. Between the short construction seasons, plaintiff maintained no forces at the site. Unconscion-

ably, it would seem, in the circumstances, the defendant never notified plaintiff of the disaster, and plaintiff learned of it only by happenstance in April. There was no unused spare cable at Tin City and it would have taken six months to have one fabricated, as it was not procurable as a stock item. The cables ordered for the new system were of different specifications and could not be used in the old. Clearly, plaintiff's whole plan of installing the new towers lay under a dire threat.

Certain resourceful employees of defendant endeavored to save the situation by cutting out of the track cable the obviously damaged portion in the vicinity of towers 7 and 8, 1,250 feet, and coupling in an equal length cut from the best section of the cable that had failed in 1958, but was still at Tin City. The system did in fact operate with this jury rig until it was dismantled to make way for the new tramway. Some 6,000-pound loads were carried safely. It was the "official position" of the Army Engineers that a safe 6,000-pound capacity was restored, they would have signed a certificate to that effect, like the one used for Lisburne, and the litigation position of the Government before the Board was to the same effect. The plaintiff, however, did not agree, and neither, ultimately, did the Board.

Back in May 1960, plaintiff had retained as consultant on the Lisburne-Tin City contract, a Canadian engineer, one McLellan, who had had much experience with tramways. He visited Tin City in September and made a "cursory survey" of the existing tramway, seeing, apparently, nothing to cause him any alarm. Thereafter he was employed on the working drawings and engineering details of the new tramway. On learning of the January break, plaintiff sent him to Tin City. It is needless to recount all his activities; suffice it that he sounded a loud alarm as to the safety of the jury rig cable, and plaintiff fully backed his position. At the joint inspection, pursuant to the contract, on June 23, 1961, he represented the contractor. At that time defendant refused to run a test load of over 3,800 pounds, relying on the Air Force regulation. Plaintiff rejected the tram unless the defendant would warranty the soundness of the cable, which it refused to do.

Mr. McLellan testified at length before the Board. Basically his position was that a cable made up by coupling together cables that had failed because of ice overload could not be trusted. Cutting out the evidently damaged parts would not give assurance that other strands had not been strained beyond their elastic limit. The couplings too, were a source of danger even if strong. The emergency brake supplied in case of a runaway might close on one of them, producing a stoppage so sudden that passengers and freight would be hurled from the car. The only sound procedure after a break due to ice overload was to substitute a new intact cable with no history of failure. He also calculated that the track cable intact had a safety factor of but 2.78 whereas a factor of 4 would be required under a number of safety codes, including the American Standard Safety Code incorporated by reference in the contract.

█ The Board's findings are that the tramway was not safe to use for erection purposes and plaintiff's decision not to use it was reasonable. These are plainly supported by substantial evidence. Besides the McLellan testimony the Board refers to the Army Engineer's own regulation which appears to prohibit retention and re-use of a failed cable, and which requires retention of a supply of parts to replace parts subject to wear. It might have noted the plain indications in the record that despite the "official position" of the Engineers, personnel at the site were far from being unanimous that the repaired cable could be trusted. That the tram as purportedly repaired, was unsafe, is no longer in issue here. The Board refers to the deficient safety factor only in connection with plaintiff's rejection of the tramway, apparently not regarding it as a defect plaintiff should have discovered on reasonable site inspection.

Fortunately the plaintiff, as a hedge against the outcome of the joint inspection, had already added to the tower components it shipped by barge from Seattle, the equipment it would need for installation without help of the tramway. These were, primarily, a caterpillar tractor and a mobile crane. Though installation work was delayed by an ironworker's strike, it was in fact completed during the 1961 construction season. Otherwise, no doubt, the amount in litigation would be much larger. Basically, what is for determination here is a claim for the difference between the cost to plaintiff of doing the job with and without the existing tramway for assembly of the tower components. There is evidence that plaintiff did use the tramway for other purposes, both in 1960 and 1961, to the extent it was helpful.

■ The Board seems to think that plaintiff's interpretation of the contract would have committed the Government

> \* \* \* to be prepared to undertake expensive repairs to a system that was going to be torn down in a few weeks. \* \* \*

This, as regrettably so often with Wunderlich Act Boards, is a commingling of fact finding and law. Before we get to the law, it is necessary to winnow out the fact finding and see if it is supported by substantial evidence. Apparently in this assertion there are embedded the following two fact findings:

> a) That the repairs required by the plaintiff's position (which as will be seen, is the court's) would have been costly.

> b) That such cost would have had to be incurred within a few weeks before dismantling of the facility.

If we assume, *arguendo* for the moment, that defendant was required to maintain the facility in a shape as usable for plaintiff's purposes as it was when the contract was let, there was only one important thing it did not do that it should have done. That was to keep a spare track cable at Tin City at all times, and not one that had already failed. By un-

controverted evidence, this would have been standard engineering practice and was required by Army Engineer regulations. The record does not show the cost of doing it, but does show it would have been trifling compared to the amount involved in this claim. When the contract was let, it became immediately apparent that the old tramway at Tin City would continue in use for at least fourteen months, not only for its usual function in support of the radome, but also additionally for support of the construction operation. Ordering a new cable then would have made sense; ordering one within a "few weeks" of dismantling would have been futile because it could not have been delivered in time to be of use.

Thus neither fact finding a) nor b) above has any basis in substantial evidence, and both will be disregarded by us in coming to our conclusion.

Stripped of support in certain fact findings based on mere assumption and not substantial evidence, the legal position of the Board may be restated as being that in the contract with plaintiff, the defendant assumed no obligation to maintain the existing tramway in the condition it was in at the contract date, but only to turn it over in Spring 1961 at the contractor's request, in whatever condition it might then be in, due to stress of weather or any other cause intervening.

This was not the position of either party before the Board. That it was not the plaintiff's can occasion no surprise, but perhaps we should substantiate the point as to defendant by quoting from its brief to the Board, (p. 20):

> The Government's defense is based on the major premise that the tramway was available, operable and used when needed, *thus fulfilling its contractual obligation* \* \* \* (pp. 21–22):

> The Government does not deny that it was obligated to furnish the existing tramway for such use as appellant chose to make of same. \* \* \*

> \* \* \* \* \* \*

That the Government recognized its obligation to furnish an operable system there can be no doubt. During the approximate period 23 May to [22] 24 June 1961, Air Force employees regularly assigned to making repairs, were engaged in restoring the system to its normal intended use. * * * All are in accord that as repaired the system was capable of operating at 6,000 lb. loads, its design capacity. * * * (p. 27):

Substantial evidence of record supports a favorable finding that the Government, *pursuant to its contractual obligation,* did furnish an operable tramway for Appellants use during the construction seasons 1960 and 1961; that said tramway was capable of operating under its design load of 6,000 pounds * * * (Emphasis supplied.)

Thus it appears that until the Board told it otherwise, the Government did suppose it had a contractual obligation to maintain a tramway with 6,000 pounds capacity through the 1961 construction season. In view of the importance attached in contract interpretation to the practical construction given by the parties, see, e. g., Maxwell Dynamometer v. United States, supra, it would seem any tribunal rejecting an interpretation shared by both contracting parties ought to be sure it is right and be able to show why. We cannot say the Board has done this here.

█ The common sense interpretation of the contract clauses in the appendix, in light of the established facts (and excluding unfounded assumptions) is that the contractor intended to use the old tramway in the manner most beneficial to expeditious and economical performance, and the Government wanted it to. This was the "intended use." In Thompson Ramo Wooldridge Inc. v. United States, supra, we had to construe contract clauses much like those here involved. We said in substance that the most advantageous use reasonably in contemplation is the "intended use." If the Board had had this decision before it (it could not have, due to the time ele-

ment) and if it had not mistakenly supposed the unsafeness of the tramway related back to the time of contract letting, we believe its decision would have been different. At least, it would not have speculated, as it did, that the "intended use" might be one other than the most advantageous.

Up to the spring "joint inspection" the tram was in the hands of the Government, according to the contract, for the purpose, among others of "maintenance."

If the contractor's subjective intended use had been feasible only in light of the nominal, but not under the actual, capacity of the tramway, as of the time of contract letting, there would have been a serious question whether the subjective intent would be the "intended use", particularly in light of the site inspection article and if the Government made no representation that the nominal capacity was actual. We need not strive to state an answer now. Here we have not that difficulty, because there is no evidence the nominal and the actual capacity were not the same on the controlling date.

We think it must have been obvious to the Army Engineers, as it would be to any layman, that use of the existing tramway for erection would be advantageous and economical. Their offer to make it available was to reduce the contract price by eliminating such part of the contract cost as would have been attributable to other more expensive methods. But (it might be asked) will not the contractor know of the penchant this tramway has for breaking down and will he not add a cushion to his costs to allow for this, nullifying the price saving? No, because the provision in the Government furnished property article for an equitable adjustment in such a case will protect him, and we can insist that no such addition be made to his basic price. Then we just have to keep the tramway from breaking down, or restore it if it does. But does not this commit us to make expensive repairs, perhaps in the last weeks of the old tramway's life? No, if it is more advantageous to the Government we can just let the old tram-

way remain broken down and give the contractor his equitable adjustment instead!

There is nothing absurd or unreasonable about such a deal, such that the Government cannot be imagined making it. Instead, it looks like a wise and prudent arrangement, the best that could be made in the circumstances. If it has boomeranged in this particular case, that is due, not to anything being wrong with the contract, but to a failure in routine maintenance the contract negotiators could not have foreseen, namely, failure to keep a spare track cable on hand. Even so it is for speculation whether a contract without these prudent clauses would not have cost more in the overall.

■ In view of the foregoing, we hold that the "intended use" here included use of the existing tramway for erection of the new towers; that when required the existing tramway was unsuitable for such use; and that, therefore, the plaintiff is entitled to a compensating "equitable adjustment."

It remains to note the clause reading:

  \*   \*   \*   The contractor assumes all liability in the use of the existing tramway for erection purposes.

The Government claims this affords a defense to its liability in this action. We do not agree. It would require a violent distortion of the language. The natural application is to liability to third persons resulting, e. g., from operation of the tramway by the contractor. Contracting parties intending to waive liabilities vis-à-vis one another normally do so in different terms.

■■ It may be added that the fact recitals in this opinion are based on the Board's findings, or on evidence before the Board. As we have held, "Where an administrative board has failed to make a relevant finding of fact as to which the evidence is undisputed, this court has made such finding rather than referring the matter to the board. [case cited.] Likewise, where the evidence is disputed but it is of such a nature that as a matter of law the Board could have made only one finding of fact, it would seem that this court can make that finding without sending the matter back to the Board for determination of the factual issues \* \* \*." Maxwell Dynamometer v. United States, supra, 386 F.2d 855, at p. 870.

The fact statements herein are made in accordance with the above considerations and may be considered fact findings of the court.

■ Finally, the plaintiff contended that its subcontractor incurred increased expenses (relating to overtime pay, larger force, and loss of efficiency) because of the defendant's failure to extend the completion date of the contract to reflect delays caused by a strike of ironworkers which occurred from approximately June 26, 1961 to late July 1961, thus forcing the subcontractor to accelerate its performance in order to complete the job within the unextended contract performance period. Our commissioner found that the plaintiff had failed to advance or perfect this claim administratively, and thus was foreclosed to that extent in this court. In its last brief before this court the plaintiff abandoned this claim and submitted that the commissioner's report was correct and that it should be approved. Though we have taken a different route on the main issue than did our commissioner, we agree with his decision regarding the acceleration expenses attributable to the strike.

It is concluded that the Board was in error in failing to grant the plaintiff an equitable adjustment under the Government furnished property clause. Proceedings here will have to be suspended so that the parties can return to the Armed Services Board of Contract Appeals for determination of the amount due the plaintiff. United States v. Anthony Grace & Sons, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).

### APPENDIX

"U–1–05 TOWER:

a.   \*   \*   \*

"(2) The existing towers and tramway may be used in erecting the new

towers and tramway. The contractor assumes all liability in the use of the existing tramway for erection purposes."

\* \* \* \* \* \*

"SC–31 JOINT INSPECTION OF TRAMWAYS: The Contractor and Contracting Officer shall hold a joint inspection of the existing tramways at such time the Contractor shuts down his construction operation for the winter. After the joint inspection of Contractor and Contracting Officer, the tramways shall be turned over to the using service at each site for winter operation and maintenance. A joint inspection by the Contractor and Contracting Officer shall be held again at the start of the Construction season. After satisfactory joint inspection by Contractor and Contracting Officer in the spring, the existing tramways at each site shall be turned over to the Contractor for his care."

The following contractual provisions are also applicable:

"Clause 38. GOVERNMENT-FURNISHED PROPERTY. (a) The Government shall deliver to the Contractor, for use in connection with and under the terms of this contract, the property described in the Schedule or specifications, together with such related data and information as the Contractor may request and as may reasonably be required for the intended use of such property (hereinafter referred to as 'Government-furnished Property'). The delivery, performance, or completion dates for the supplies, services, or construction to be furnished by the Contractor under this contract are based upon the expectation that Government-furnished Property suitable for use will be delivered to the Contractor at the times stated in the Schedule or, if not so stated, in sufficient time to enable the Contractor to meet such delivery, performance, or completion dates. In the event that Government-furnished Property is not delivered to the Contractor by such time or times, the Contracting Officer shall, upon timely written request made by the Contractor, make a determination of the delay occasioned the Contractor thereby, and shall equitably adjust the delivery, performance, or completion dates or the contract price, or both, and any other contractual provision affected by such delay, in accordance with the procedures provided for in the clause of this contract entitled 'Changes.' In the event the Government-furnished Property is received by the Contractor in a condition not suitable for the intended use the Contractor shall, upon receipt thereof, notify the Contracting Officer of such fact and, as directed by the Contracting Officer, either (i) return such property at the Government's expense or otherwise dispose of the property, or (ii) effect repairs or modifications. Upon the completion of (i) or (ii) above, the Contracting Officer upon written request of the Contractor shall equitably adjust the delivery, performance, or completion dates or the contract price, or both, and any other contractual provision affected by the rejection or disposition, or the repair or modification, in accordance with the procedures provided for in the clause of this contract entitled 'Changes.' The foregoing provisions for adjustment are exclusive and the Government shall not be liable to suit for breach of contract by reason of any delay in delivery of Government-furnished Property or delivery of such property in a condition not suitable for its intended use. (b) By notice in writing the Contracting Officer may decrease the property furnished or to be furnished by the Government under this contract. In any such case, the Contracting Officer upon the written request of the Contractor shall equitably adjust the delivery, performance, or completion dates or the contract price, or both, and any other contractual provisions affected by the decrease, in accordance with the procedures provided for in the clause of this contract entitled 'Changes.' (c) Title to the Government-furnished Property shall remain in the Government. Title to Government-furnished Property shall not be affected by the incorporation or attachment thereof to any property not owned by the Government, nor shall such Gov-

ernment-furnished Property, or any part thereof, be or become a fixture or lose its identity as personalty by reason of affixation to any realty. The Government shall maintain adequate property control records of Government-furnished Property in accordance with the requirements of the 'Manual for Control of Government Property in Possession of Contractors' (Appendix B, Armed Services Procurement Regulation) as in effect on the date of the contract, which Manual is hereby incorporated by reference and made a part of this contract. (d) The Government-furnished Property shall, unless otherwise provided herein, be used only for the performance of this contract. (e) The Contractor shall maintain and administer, in accordance with sound business practice, a program for the maintenance, repair, protection and preservation of Government-furnished Property, until disposed of by the Contractor in accordance with this clause. In the event that any damage occurs to Government-furnished Property the risk of which has been assumed by the Government under this contract, the Government shall replace such items or the Contractor shall make such repair of the property as the Government directs; provided, however, that if the Contractor cannot effect such repair within the time required, the Contractor shall dispose of such property in the manner directed by the Contracting Officer. The contract price includes no compensation to the Contractor for the performance of any repair or replacement for which the Government is responsible, and an equitable adjustment will be made in the contract price for any such repair or replacement of Government-furnished Property made at the direction of the Government. Any repair or replacement for which the Contractor is responsible under the provisions of this contract shall be accomplished by the Contractor at its own expense. (f) Unless otherwise provided in this contract, the Contractor, upon delivery to it of any Government-furnished Property, assumes the risk of, and shall be responsible for, any loss thereof or damage thereto except for reasonable wear and tear, and except to the extent that such property is consumed in the performance of this contract. (g) The Government shall at all reasonable times have access to the premises wherein any Government-furnished Property is located. (h) Upon the completion of this contract, or at such earlier dates as may be fixed by the Contracting Officer, the Contractor shall submit, in a form acceptable to the Contracting Officer, inventory schedules covering all items of Government-furnished Property not consumed in the performance of this contract (including any resulting scrap), or not theretofore delivered to the Government, and shall deliver or make such other disposal of such Government-furnished Property, as may be directed or authorized by the Contracting Officer. Recoverable scrap from Government-furnished Property shall be reported in accordance with a procedure and in such form as the Contracting Officer may direct. The net proceeds of any such disposal shall be credited to the contract price or shall be paid in such other manner as the Contracting Officer may direct. (i) Direction of the Contracting Officer and communications of the Contractor issued pursuant to this Clause shall be in writing."

"4. CHANGED CONDITIONS

The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in

writing accordingly. Any claim of the Contractor for adjustment hereunder shall not be allowed unless he has given notice as above required; provided that the Contracting Officer may, if he determines the facts so justify, consider and adjust any such claim asserted before the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof."

"GC–3 SITE INVESTIGATION: The Contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, including but not restricted to those bearing upon transportation, disposal, handling and storage of materials, availability of labor, water, electric power, roads, and uncertainties of weather, river stages, tides or similar physical conditions at the site, the conformation and conditions of the ground, the character of equipment and facilities needed preliminary to and during prosecution of the work. The Contractor further acknowledges that he has satisfied himself as to the character, quality and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from information presented by the drawings and specifications made a part of this contract. Any failure by the Contractor to acquaint himself with the available information will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government assumes no responsibility for any conclusions or interpretations made by the Contractor on the basis of the information made available by the Government. The Government also assumes no responsibility for any understanding or representations made by its officers or agents during or prior to the execution of this contract, unless (1) such understanding or representations are expressly stated in the

contract and (2) the contract expressly provides that the responsibility therefor is assumed by the Government. Representations which are not expressly stated in the contract and for which liability is not expressly assumed by the Government in the contract shall be deemed only for the information of the Contractor."