N. FIORITO COMPANY, Inc.

v.

The UNITED STATES.

No. 206–66.

United States Court of Claims.

Oct. 17, 1969.

John C. Hoover, Seattle, Wash., Atty., of record, for plaintiff. Paul R. Cressman, William L. Hintze and Short, Cressman & Cable, Seattle, Wash., of counsel.

Michael J. Rubin, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

PER CURIAM:

This case was referred to Trial Commissioner Richard Arens with directions to make recommendation for conclusions of law on plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 99(c) [since September 1, 1969, Rule 166(c)]. The commissioner has done so in an opinion and report filed on June 5, 1969, wherein such facts as are necessary to the opinion are set forth. On July 17, 1969, defendant filed a motion wherein it requested that the court adopt the report of the commissioner and enter judgment in accordance therewith. On July 24, 1969, plaintiff filed a motion joining in defendant's said request. The case has been presented to the court on the commissioner's opinion and report and the said motions of the parties without oral argument. Since the court aggrees with the commissioner's opinion and recommended conclusions of law, as hereinafter set forth, it hereby grants the motions of the parties and adopts the report, opinion and recommendations of the trial commissioner as the basis for its judgment in this case. Therefore, defendant's motion for summary judgment is granted, and plaintiff's like motion denied, on the issues discussed in the opinion as overrun, time extensions, impossibility of performance, and Board proceedings and as to these issues the petition is dismissed; plaintiff's motion for summary judgment is granted, and defendant's like motion denied, on the issues discussed in the opinion as Compaction Difficulties (other than impossibility of performance) and Haul Distances; proceedings in this court are stayed for a period of 90 days from the date hereof under Rule 167 [prior to September 1, 1969, Rule 100] to permit the Armed Services Board of Contract Appeals to determine (a) the amount of the equitable adjustment and extension of completion time to which plaintiff is entitled consistent with this opinion, because of compaction difficulties, (b) the impact of an extended contract completion date (because of compaction difficulties) on the Cure Notice and on defendant's counterclaim, (c) the amount by which an equitable adjustment of the Haul Distance should be increased by considering any fraction of a one-half mile as a one-half mile, and (d) the quantity of wasted material for which an equitable adjustment should be allowed; the parties are to comply with Rule 167 [prior to September 1, 1969,

Rule 100] and the appropriate provisions of the General Order of the court of April 1, 1968, implementing it; and upon conclusion of the Board's proceedings, the parties are to take further action for the final disposition of the case in this court.

## OPINION OF COMMISSIONER

ARENS, Commissioner.

This case, which is before the court on cross-motions for summary judgment, arises out of a contract awarded plaintiff by the United States Air Force for the rebuilding of an operational apron at the Portland (Oregon) International Airport. Plaintiff challenges the decision of the Armed Services Board of Contract Appeals on certain factual and legal issues hereinafter set forth.[1]

The major work involved in the project consisted of removing the old concrete pavement, excavating to a designated depth, stockpiling excavated material suitable for subbase or base, wasting unsuitable excavated material, compacting the left-in-place subbase, backfilling and compacting suitable subbase and base material, and constructing an 11-inch thick concrete pavement. The subbase and base were both to consist of granular, nonplastic material, but the 18-inch subbase was to be compacted to 95 percent of maximum density, while the 6-inch base was to be compacted to 100 percent of maximum density.

The project was divided into two phases, each of which consisted of half of the apron. Phase I was required to be completed before Phase II could be commenced.

The contract, awarded plaintiff, an experienced airport apron contractor, on December 20, 1962, provided that work should start within 10 days after the notice to proceed. The completion date, set by a Supplemental Agreement of May 31, 1963, was to be 155 days after the notice to proceed, which was thereafter issued on July 8, 1963, and accordingly fixed the completion date as December 10, 1963. By subsequent modification and change order, the completion date was extended to December 28, 1963.

Phase I was completed and turned over to the Air Force on October 30, 1963. Phase II was started on November 1, 1963. By February 24, 1964, the project was completed, except for the sawing and sealing of the joints on Phase II which was done by the end of March 1964.

### Overrun

▰▰▰▰▰ The contract schedule provided that 10,700 cubic yards of the base and subbase material were to come from the stockpile and that 11,800 cubic yards would be imported. When the base and subbase material from the old apron was removed, however, it proved to be unsuitable for reuse, and therefore plaintiff was required to haul all of it away and to import and place 23,800 cubic yards of base and subbase material. The parties agreed that plaintiff was entitled to an equitable adjustment because of this "overrun" but disagreed as to the interpretation of the contract specifications regarding the formula for payment. The pertinent specifications read as follows:

*SP 1-01 Description of Work* (Jul 1962)

(c) Quantity. (This paragraph is applicable to all unit price contracts but is inapplicable to all lump-sum contracts.) The Contractor may reasonably expect a variation in the esti-

---

1. ASBCA Nos. 10037 and 10041 dated February 17, 1966 (66–1 BCA ¶ 5381). In N. Fiorito Co. v. United States, 180 Ct.Cl. 1285 (1967), this court, in considering defendant's motion for summary judgment on the ground that plaintiff had failed to exhaust its administrative remedy, ruled that the "main aspect" of plaintiff's case had been decided adversely to it by the Board and that plaintiff had sufficiently pursued its administrative remedy, without the necessity of first proceeding with a remand to the contracting officer, ordered by the Board, to determine quantum on certain minor matters.

mated quantity set forth in the Schedule such that the total payment for the completed work may range from 90 percent to 110 percent of the total amount stated on the Standard Form 23 attached hereto. The Contractor will be required to complete the entire work as set forth herein subject to the allotment of sufficient funds to the contract: Provided, * * * (2) if the completed work ranges from 90 percent to 110 percent of the estimated quantities set forth in the Schedule, the contractor will be allowed no claims for anticipated profits or loss of profits or for damage of any sort because of differences between the estimate of any item and the amount of any item actually required, and (3) if work less than 90 percent or more than 110 percent of the estimated quantities set forth on the Schedule causes an increase or decrease in the unit price or prices there may be an adjustment of such prices in accordance with the procedures of Clause 3, Changes, in Standard Form 23A of this contract.

Clause 3 Changes, referred to above, read in part:

The Contracting Officer may, at any time, by written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract if within its general scope. If such changes cause an increase or decrease in the Contractor's cost of, or time required for, performance of the contract, an equitable adjustment shall be made and the contract modified in writing accordingly. In its opinion the Board stated:[2]

\* \* \* \* \* \*

The appellant and contracting officer have not reached agreement on a unit price for the overrun quantity. Although we are not deciding an equitable price for such quantities, certain matters are to be resolved prior to the remand to assist the parties in their negotiations. The appellant says that having exceeded 110 percent of the estimated quantity, the unit price for the entire overrun quantity is open to negotiation rather than just that on units exceeding the 110 percent. The Government says that only the price for units in excess of 110 percent are subject to price change. The pertinent portion of the specification provision says that "if work * * * more than 110 percent of the estimated quantities * * * causes an increase or decrease in the unit price or prices there may be an adjustment of such prices * * *." The clause appears to contemplate that if the reasonable cost of performing units of work which exceed 110 percent of the estimated number of units of work is greater than the originally-stated unit price, then that unit price shall be modified to reflect the higher cost of the units above 110 percent of the estimate. Presumably a new price would be negotiated for all units of work, but the only units which would serve to change the original bid price are those above 110 percent of the originally-estimated quantity. This, in somewhat different language, agrees with the Government's interpretation of the clause's applicability.

\* \* \* \* \* \*

Should the equitable adjustment encompass the entire increase in quantity of overrun, as contended by plaintiff, or should the equitable adjustment be limited to the quantity of overrun which exceeded 110 percent of the original estimate, as contended by defendant? In other words, is the initial 10 percent overrun computed under the original unit price cost, or is it to be included in the equitable adjustment? The issue presented is, of course, one of law which this court is free to answer independently of the Board's decision. Perini Corp. v. United States, 381 F.2d 403, 180 Ct.Cl. 768 (1967).

2. The parties stipulated at the Board hearing that the Board would decide questions of entitlement only, "leaving for remand to the contracting officer and negotiation the question of an equitable adjustment, if any."

The cases cited by the parties to support their respective positions are so dissimilar in facts and in contract provisions as to be of no guidance in resolving the issue under consideration.[3] Although the specification could perhaps have been drafted with greater clarity, it cannot be concluded that it is ambiguous so as to require that the scales be weighted against the Government. Keco Industries v. United States, 364 F.2d 838, 176 Ct.Cl. 983 (1966), cert. denied 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 105 (1967); Ace Constr. Co. v. United States, 401 F.2d 816, 185 Ct.Cl. 487 (1968). It would appear that the best guide under the circumstances is "the traditional principle that the contract words must be interpreted as they would probably be understood by reasonable men standing in the parties' shoes." Deloro Smelting & Refining Co. v. United States, 317 F.2d 382, 161 Ct.Cl. 489 (1963). A fair reading of the specification in this light confirms the conclusion reached by the Board that the initial 10 percent of the overrun was to be computed under the original unit price cost and that only the overrun which exceeded 110 percent of the original estimate was to be included in the equitable adjustment.

A related issue before the Board was the amount which should be paid for compaction of the overrun. Sections 11–09 and 11–10 of the MEASUREMENT AND PAYMENT section of the Technical Provisions, read in part as follows:

> *11–09. Bid Item No. 7—Imported Base or Subbase Embankment.—* * * * The unit of measurement and payment shall be the cubic yard. * * * Payment under this item constitutes full compensation for all work necessary to furnish, load, haul, and deposit in the designated area base and subbase material, including moistening, drying, grading, and com-

pacting to 95 percent of maximum density as specified; and all incidental work involved. * * *

> *11–10. Bid Item No. 8—Compaction of Base.—* * * * The unit of measurement and payment shall be the square yard. * * * Payment under this item constitutes full compensation for all work necessary to increase the density of the base from 95 percent to 100 percent of maximum density as specified, including moistening, drying, and grading; and all incidental work involved. * * *

The Board stated:

> * * * * * *

> In computing a new price for Item 7, Imported Base or Subbase Embankment, we think it quite clear that the appellant is entitled to be paid under that item for the cost of compacting the subbase to 95 percent of maximum density (TP 11–09). We think that a determination of a new price for Item 7 is not as such limited by the original bid price for Item 6, Base or Subbase Embankment from Stockpile, which item was eliminated. We think that appellant is not limited by the $5.18 per cubic yard offer it made at an earlier time. Both of these figures may be considered by the contracting officer as a matter of some evidence of an equitable price, just as he should consider the contractor's alleged costs of performance as some evidence of what reasonable and equitable costs are. We find that TP 11–10, COMPACTION OF BASE, is perfectly clear that the cost of compacting the base course to 100 percent is to be included under Payment Schedule Item 8, paid for on a square yard basis. We have not overlooked appellant's testimony that it intended only a quick final roll under this item. Other effort to reach 100 percent compaction must have been included in other bid items in spite of the contract

3. Plaintiff cites United States v. Pickett's Food Service, 360 F.2d 338 (5th Cir. 1966). Defendant cites Womack v. United States, 389 F.2d 793, 182 Ct.Cl.

399 (1968) and United Contractors v. United States, 368 F.2d 585, 177 Ct.Cl. 151 (1966).

language. This circumstance now doubtless results in a sad unbalancing among bid items. But that does not change the clear definition of what was to be paid for under bid Items 8 and 7. [At p. 25,260.]

\*  \*  \*  \*  \*  \*

In reading the contract from its four corners, it is clear that the previously quoted provisions for adjustment in prices for the overrun (SP 1–01) did not displace the clear and unambiguous provisions of TP 11–10, COMPACTION OF BASE, and that the Board's interpretation was correct. Wertheimer Constr. Corp. v. United States, 406 F.2d 1071, 186 Ct.Cl. 836 (1969); Red Circle Corp. v. United States, 398 F.2d 836, 185 Ct.Cl. 1 (1968).

### Phase II Compaction Difficulties

The original contract required that the 6-inch base (immediately below the concrete) be sand, but at plaintiff's request a change order was issued to substitute crushed rock in lieu of sand for the top 3 inches of the base, and the crushed rock was so substituted in Phase I work. In Phase II work, however, with the full knowledge of Government personnel, plaintiff reverted to the original contract provisions for sand for the entire 6-inch base.

Plaintiff recognized as normal in airfield construction a 100 percent compaction requirement for the top 6 inches below concrete and had previously met that requirement, although such compaction is concededly difficult to accomplish in a sand base.

Plaintiff attained the required 95 percent compaction in the subbase without difficulty, but experienced great difficulty and consumed much more time than it anticipated in attempting to attain 100 percent compaction in the base. Plaintiff had expected to attain 100 percent compaction of the base with about four passes of heavy rolling equipment in about 4 days' time, but actually made as high as thirty passes and resorted to various types of equipment in its effort

to attain the 100 percent compaction. Actually, plaintiff did not attain uniform 100 percent compaction, but defendant accepted the work as satisfactory. Plaintiff asserted before the Board that its compaction difficulties were caused by defendant's improper testing procedures, both in the laboratory and in the field tests; and that the specification requirements as interpreted by defendant were practically impossible of performance.

The specifications provided that the sample to be tested for compaction was not to be oven-dried or subjected to any artificial drying before processing or testing. The evidence established and the Board found that defendant's inspectors violated the specifications in the testing procedures by projecting the compaction curve from the air-dry state to an oven-dry state, so that a field compaction result which appeared to be only 99.4 percent of maximum laboratory density was in fact 100 percent.

The Board stated:

\*  \*  \*  \*  \*  \*

\* \* \* The architect-engineer used a figure of 103 pounds per cubic foot to compare field densities. He thus used to establish the 100 percent requirement a figure 0.6 pounds higher (or a little less than 0.6 percent more) because of the projection of the compaction curve to the oven-dry or 0 percent moisture stage than they would have been had the density readings for the air-dry state been utilized. It appears that Mr. Lindquist, the chief inspector for the architect-engineer, generally, though not always, accepted as passing a density reading of 99 percent \* \* \*. He apparently exercised some personal judgment in determining whether to accept a particular density test reading of 99 percent as passing. Of approximately 137 field density tests taken in Phase II, 13 had density readings between 99.4 and 99.8 percent of maximum density and eight between 99 and 99.4 percent. All other readings were

either below 99 percent or at or above 100 percent * * *. [At p. 25,254.]

* * * * * *

The Board further stated:

* * * * * *

* * * If the architect-engineer had been rejecting compaction results from 99.4 percent through 99.9 percent and there had been a substantial number of such readings, then this failure to follow the specifications correctly would have been a serious delinquency probably causing the contractor extra work. Such, however, was not apparently the case. Of approximately 137 field density tests taken in Phase II, 13 had density readings between 99.4 percent and 99.8 percent of maximum density and eight between 99 percent and 99.4 percent. In view of the testimony and the record of acceptances of compaction results, it appears that a great percentage of these apparent failures was in fact accepted as having met the requirement of 100 percent of maximum density. The result of the Government's improper projection of the compaction curve had thus at the most a very minimal effect on appellant's efforts to achieve satisfactory compaction results. It is not possible to determine from the record what this minimal effect might have been. [at p. 25,-258.]

* * * * * *

The specifications also provided that in making the field density test, "All loose soil shall be removed from an area large enough to place the soil tray and a plane surface shall be cut for bedding the tray firmly." At the Board hearing, defendant's resident engineer testified that in making the field tests the loose soil as such was not removed, but that only the "fluff," consisting of less than an inch, was removed by the process of "scooting the plate around on the surface so that it sets flush." The Board found that the Government inspectors, in making the field density test, scraped away "only such small amount of sand as might be necessary to get a level and firm seating of the surface plate."

Plaintiff's expert in soil mechanics testified that the density of a sand sample increased with depth; that in making a field density test of a sand base the top one or two inches of surface sand should first be scraped away because it is in a "loose" non-cohesive uncompacted state; that the field test would then correspond to the laboratory test in which about 2 inches of the sand which is in a collar at the top of the mechanism is so removed. He stated that if the top 2 inches of loose soil had first been scraped off the surface in the field test, "then the relative compaction certainly would have been increased considerably over the values reported." The essence of the testimony by plaintiff's expert in soil mechanics was repeated by plaintiff's expert on material testing. Defendant's chief of the Engineering and Construction Branch of the Civil Engineering Section at Portland Air Force Base testified that he had personally observed Corps of Engineers personnel taking density tests (under similar circumstances) and that only about one-fourth inch of sand was first scraped away.

The Board stated that defendant's inspectors "thought the specification requirement for 100 percent compaction for the six-inch layer meant just that for the entire height of the layer and not just the bottom four or five inches and therefore that it would have been improper to scrape away one or two inches in taking the density test."

The Board further stated:

* * * * * *

* * * We are impressed with the qualifications and experience of appellant's expert and with the plausibility of his explanation as to why it is reasonable to scrape away one or two inches of sand from the top down in taking field density tests and therefore why his firm follows that practice. We are at the same time faced

with a specification that requires 100 percent density for the six-inch base course. That requirement applies to the entire six inches, not just in the bottom four or five inches of the course. We find it hard to read that specification to mean anything less that what it says. The AASHO testing standard specified says nothing which, when read together therewith, would change, modify or explain the specification language and requirement. Mr. Wilson candidly stated that he could not say that the practice of his firm was universal or standard practice in taking compaction tests in sand. The evidence of the procedures employed by the Corps of Engineers was conflicting and inconclusive. Reading the contract requirement and viewing the architect-engineer's procedures, we cannot find that the latter were improper. The contracting officer's and architect-engineer's enforcement of specification requirements was strict, but we cannot find that it was excessive so as to constitute a change or extra work. [At p. 25,258.]

\* \* \* \* \* \*

Defendant also adduced testimony to the effect that plaintiff showed a lack of organization, system and purpose in its compaction efforts. The final report dated March 10, 1964, prepared by defendant's consulting engineers stated, however, that plaintiff's "workmanship and material are of high quality."

On the issue of practical impossibility of performance, the Board stated:

\* \* \* \* \* \*

\* \* \* This contractor did eventually perform successfully. There is also absent here the very significant element of superior knowledge on the part of the Government vis-a-vis the contractor. On the contrary, the appellant points out vigorously that the Government's representatives were no better able to devise a successful scheme for attaining the 100 percent compaction requirement than were appellant's employees. There was no virtual concealment of knowledge of impending difficulties which the Government had and appellant did not, and which the Government should have expected appellant to be unaware of. On the contrary, this is the type of case in which principal reliance is placed upon the skill and "know-how" of the contractor. This was not a new type of work reaching to or beyond the limits of the state of the art. Compaction, even to 100 percent of maximum density, is an old story. We do not doubt that appellant spent more time and effort in completing its Phase II compaction than it had expected. But this is not sufficient, for as the Restatement of Contracts observed:

" \* \* \* Mere unanticipated difficulty, however, not amounting to impracticability is not within the scope of the definition [of impossibility] \* \* \*." (Restatement, Contracts § 454, Comment a (1932))

We do not think appellant has made out a case of legal impossibility of performance. [At p. 25,257.]

\* \* \* \* \* \*

From a review of the entire record in the case, it is concluded that, as hereinafter discussed, the Board's ultimate findings of fact pertaining to the tests and their consequences are in important particulars not supported by substantial evidence and are contrary to the overwhelming weight of the evidence; and that the Board's legal conclusions on related issues are erroneous.[4]

■ The evidence is undisputed that not only is 100 percent compaction of sand difficult to achieve, but that the difficulty increases as the compaction nears 100 percent and that virtually all

4. *See* Perini Corp. v. United States, *supra;* Koppers Co. v. United States, 405 F.2d 554, 186 Ct.Cl. 142 (1968); Woodcrest

Constr. Co. v. United States, 408 F.2d 406, 187 Ct.Cl. 249 (1969), petition for cert. filed July 28, 1969, No. 401.

of the difficulty occurs within the last 5 percent. It is obvious then that what might appear to be only a slight increase in the compaction requirements within the 95 to 100 percent range of compaction has a relatively great impact on the amount of work required. In the instant case the 0.6 percent error resulting from the improper protection of the compaction curve affected all of the test readings. But for this error, eight tests would not have shown between 99.4 percent and 99.9 percent, but would have indicated that compaction was at or above 100 percent, and the tests which revealed 100 percent compaction would have indicated that compaction was actually greater than the initial contract requirements. The importance of this error can be further appreciated in light of the very slight variations from 100 percent compaction (including the error) which defendant ultimately accepted after plaintiff was persisting in its efforts to achieve a compaction which was actually (including the error) more than 100 percent. Plaintiff was not, as the Board suggests, attempting "to achieve satisfactory compaction results." Plaintiff was, because of defendant's error, attempting to achieve actually more than 100 percent compaction results. The Board's conclusion that the Government's improper projection of the compaction curve had at the most a very minimal effect, cannot under Wunderlich Act[5] standards be sustained.

The contract requirement for 100 percent compaction of the base can easily be harmonized with the specification on the making of the field density test, so that in testing for 100 percent compaction of the base, the loose soil is first removed. Morrison-Knudsen Co. v. United States, 397 F.2d 826, 184 Ct.Cl. 661 (1968). The Board's interpretation of the specification on the making of the field density test fails to give proper emphasis to the provision for the removal of the loose soil and, accordingly,

the Board accepted an improper field density test, with the result that the readings cast on plaintiff an additional unwarranted compaction burden which bore heaviest when the compaction was reaching the ultimate goal.

Although it cannot be concluded from the record as a whole that the Board's finding that there was not legal impossibility of performance, is not supported by substantial evidence, the evidence is overwhelming that the aggregate effect of the improper projection of the compaction curve and the improper field density test was to increase significantly the contract compaction requirements with a corresponding increase in plaintiff's costs and time of performance, for which it should have been accorded an equitable adjustment under the changes article of the contract, and an extension in completion time. L. W. Foster Sportswear Co., Inc. v. United States, 405 F.2d 1285, 186 Ct.Cl. 499 (1969); Red Circle Corp. v. United States, supra; Morrison-Knudsen Co. v. United States, 345 F.2d 535, 170 Ct.Cl. 712 (1965); Len Co. & Assoc. v. United States, 385 F.2d 438, 181 Ct.Cl. 29 (1967). Defendant's ultimate acceptance of some compaction less than that indicated to be required by the tests, does not overcome the fact that plaintiff expended considerable additional time and effort meeting or attempting to meet what amounted to increased contract requirements.

### Time Extensions

■ As heretofore indicated, the contract completion date, as extended by modification and change order was December 28, 1963.

Plaintiff's claim and the Board's findings pertaining to time extensions for the overrun, were stated by the Board as follows:

\* \* \* \* \* \*

The appellant's position on the time extension for the overrun in imported subbase and base course material is

5. 68 Stat. 81, 41 U.S.C. §§ 321–322 (1964).

not spelled out more precisely than the statement that this should entitle appellant to about one month of additional time. In Phase I the contractor's schedule indicated that it anticipated importing subbase and base course material during a two-week period. On how many days of that period it planned to bring in material does not appear. In fact, the great bulk of the material (over 80 percent) was hauled on seven days during the first nine days of the four-week period over which fill was imported. Thereafter, relatively small amounts were imported on scattered days during the rest of the period. Within the period equivalent to that originally anticipated for importation, all but about seven percent of the quantity of subbase and base course granular material used for Phase I was imported. So far as we can determine, rock importation took about three days. On 17 September 1963, after all base and subbase materials had been imported for Phase I, the parties executed Modification No. 5, which extended the contract completion date by 10 days. That modification did not identify the reasons for the 10-day time extension. It brought the contractor's performance back up to schedule as of that time. The contractor's letter returning the modification expressed reservations on time as to the future but no disagreement with the time that had been granted for events past. We conclude that adequate time for the overrun in base and subbase material in Phase I has been granted.

In Phase II the appellant's original progress chart contemplated importing granular subbase and base course material during the two-week period, 20 October through 2 November. Fill was actually hauled on 13 days during the period 19 November through 6 December. The total actual period exceeded that originally contemplated by four days. We cannot determine on how many of the days during the originally-scheduled period the con-

tractor intended actually to haul material. If it intended to work at the importation on each of the normal workdays during the scheduled period, then the excess of actual workdays over anticipated would be three. By Modification No. 8 the contracting officer unilaterally extended the contract completion date by eight days to 28 December 1963 because of the increased quantity of Item 7 added to the contract by Modification No. 6. We find this time extension equitable. Modification No. 8 was dated 23 January 1964. Since the contractor had not completed its work by 28 December, we do not perceive damage to it because the modification was not issued at an earlier date. [At p. 25,-259.]

\* \* \* \* \* \*

From an examination of the pertinent parts of the record, it is concluded that the Board's findings regarding time extensions for the overrun are supported by substantial evidence.

Plaintiff claimed that it was delayed 2½ days in beginning its work on Phase II because the Air Force failed to move planes promptly out of the next work area. Defendant's witnesses testified before the Board, however, that plaintiff's work was not actually finished on Phase I at the time in question, and that plaintiff did not actually intend to begin its work on Phase II at that time. There was substantial evidence to support the finding by the Board that the Government was responsible for a one-day delay in the moving of the planes, for which the completion date was extended by one day and an adjustment was made for plaintiff's standby expenses.

Plaintiff claimed entitlement to time extensions because of weather delays. The Board noted that the weather indicated at certain times in question could not be regarded as "unusually severe" for Portland, Oregon, but the Board observed:

\* \* \* \* \* \*

\* \* \* The Government's brief, however, concedes that the December

weather would entitle the contractor to a five-day time extension. On the basis of this concession, we assume that the contracting officer will or has granted such extension and we would not be disposed to gainsay that position. * * *. [At p. 25,259.]

*   *   *   *   *   *

It cannot from the record be found that the Board's conclusion on weather delays failed to meet applicable Wunderlich Act standards.

## Cure Notice

■ Special Provision 1–06(b) provided:

(b) The Contractor shall furnish sufficient forces, construction plant, and equipment, and shall work such hours, including night shifts, overtime operations, and Sunday and holiday work, as may be necessary to insure the prosecution of the work in accordance with the approved progress schedule. If, in the opinion of the Contracting Officer, the Contractor falls behind the progress schedule, the Contractor shall take such steps as may be necessary to improve his progress, and the Contracting Officer may require him to increase the number of shifts, and/or overtime operations, days of work, and/or the amount of construction plant, all without additional cost to the Government.

On November 27, 1963, the contracting officer sent plaintiff a "cure notice" directing plaintiff, then behind its progress schedule, "to increase the number of shifts and/or overtime operation, days of work, and/or amount of construction plants, all without additional cost to the Government, to the extent required to improve progress." In considering plaintiff's claim for an equitable adjustment to compensate it for the extra costs of accelerating its performance, the Board observed that the claim depended on whether plaintiff "was entitled to extensions of its performance time which would have permitted it to work to completion without any increase in workdays, hours, forces, or equipment." The Board

then considered the extensions of time which were allowed by it or conceded by the Government, and decided that since plaintiff did not complete performance by the extended completion date, that the cure notice was "proper within the contemplation of Special Provision 1–06 and did not constitute a change to the contract."

It is obvious that this decision must be reappraised in light of the conclusion heretofore reached that plaintiff was entitled to an extension of completion time because of compaction difficulties.

## Haul Distances

■■ The parties disagreed on the computation of the haul distance and the price for hauling to waste the old subbase material after it was decided to dispose of it rather than to stockpile it. Plaintiff contended for a price of $0.16 per cubic yard per mile with any fraction of a half-mile rounded up to the next full one-half mile. Defendant agreed to the $0.16 per cubic yard per mile price, but argued that computation should be based on actual haul distance without any arbitrary rounding. The Board stated:

*   *   *   *   *   *

The parties disagree on calculation of distance and price for haul to spoil areas of material excavated and wasted instead of stockpiled. We conclude that actual haul distances should be employed. The fact that by definition in its specifications the State of Washington rounds distances up to one-half mile segments does not establish an invariable practice for other parties. By the same token, a fair price per mile per ton or cubic yard should be just that, and a price quoted or agreed to on the assumption of a higher arbitrary rounded distance figure would not necessarily be fair for a lower actual distance figure. [At p. 25,260.]

*   *   *   *   *   *

In this court, defendant contends that the Board's evaluation is reasonable and therefore cannot be disturbed. It is clear, however, that the formula for computing an equitable adjustment is a

question of law which this court decides independently. Keco Industries v. United States, 364 F.2d 838, 176 Ct.Cl. 983, (1966), cert denied 386 U.S. 958, 87 S. Ct. 1027, 18 L.Ed.2d 105 (1967). It is also clear that the Board's underlying factual conclusions are not supported by substantial evidence. The only evidence in the record on the issue is that the trade practice in the area in which the work was performed was to pay a haul rate of $0.16 per cubic yard per mile and to consider any fraction of one-half mile as a one-half mile, and that $0.16 a mile would be too low a price unless the trade practice on a fractional one-half mile were followed. WRB Corp. v. United States, 183 Ct.Cl. 409 (1968); S. S. Mullen Inc. v. United States, 389 F.2d 390, 182 Ct.Cl. 1 (1968). The equitable adjustment should therefore embrace any fraction of one-half mile as a one-half mile.

In a related question, plaintiff challenged before the Board the determination made by the contracting officer of the quantity of wasted material for which it should be given an equitable adjustment for hauling, but the Board failed to decide the question. It would appear that upon suspension of proceedings in this court, the Board should consider and decide this related question.

### Board Proceedings

█ Plaintiff alleges that the "Board acted arbitrarily and capriciously, in violation of the plaintiff's right to procedural due process, and in violation of plaintiff's constitutional right to cross-examine defendant's witnesses when it permitted the introduction into evidence, over plaintiff's objection, of the diary of Mr. Don Langford (an employee of the engineering firm hired by defendant to inspect plaintiff's contract work) without permitting the plaintiff to interrogate said witness."

Rule 14(a) of the Rules of the ASBCA provides:

(a) *When Depositions May be Taken.* After an appeal has been docketed, the Board may, upon application of either party or upon agreement by the parties, permit the taking of the testimony of any person, by deposition upon oral examination or written interrogatories, for use as evidence in the appeal proceedings. Leave to take a deposition will not ordinarily be granted unless it appears that it is impracticable to present deponent's testimony at the hearing of the appeal, or unless a hearing has been waived and the case submitted pursuant to Rule 11.-32 C.F.R. § 30.1 (1966)

＊ ＊ ＊ ＊ ＊ ＊

Prior to the Board hearing, plaintiff requested permission to take the deposition of a number of persons, including Mr. Langford. In denying plaintiff's request, the Board stated: "[I]n the absence of a showing that it is impractical to present such testimony at the hearing of the appeal, your application is hereby denied." At the Board hearing, over plaintiff's objection, Mr. Langford's diary was admitted into evidence and another witness for defendant testified concerning entries in the diary. In admitting the diary into evidence, the presiding Board member stated that it was "admissible in any event as having been kept in the regular course of business."

It is clear that the Board did not violate its rules in denying plaintiff's request to take the deposition and that plaintiff did not, as found by the Board, show that it was impracticable to present the testimony at the hearing. Cohen v. United States, 369 F.2d 976, 177 Ct.Cl. 599 (1966), cert. denied, 387 U.S. 917, 87 S.Ct. 2029, 18 L.Ed.2d 969 (1967); Robertson Elec. Co. v. United States, 176 Ct.Cl. 1287 (1966).

The procedures before the Board need not, moreover, be cast in the mold of court proceedings. Prater v. United States, 172 Ct.Cl. 608 (1965); and plaintiff has not demonstrated that the admission of the diary into evidence was, under the circumstances, improper or that it was prejudiced thereby. J. D. Hedin Constr. Co. v. United States, 408 F.2d 424, 187 Ct.Cl. 45 (1969).

**1296**

*Defendant's Counterclaim*

The contracting officer, by finding and decision of April 28, 1964, determined that plaintiff owed defendant $11,707.18 in actual damages because of failure to complete the contract on time. Subsequently this amount was released to plaintiff upon agreement that it would be repaid to defendant with interest if it was determined to be due and owing.

The Board stated:

\* \* \* \* \* \*

The assessment of actual damages \* \* \* is dependent upon the time of completion of the contract work in relation to the properly-extended contract completion date. The latter has been determined by this decision. Without expressing any opinion thereon, we recommend to the contracting officer careful consideration of the appellant's contentions regarding substantial completion and Air Force use of the apron before the subcontractor finished the entire sealing work. [At p. 25,260.]

\* \* \* \* \* \*

On April 25, 1965, after the decision of the Board, the contracting officer offered to reduce the amount of the Government's damages to $8,828.46 with interest, and it is this amount for which defendant now seeks judgment.

In view of the conclusion heretofore reached that plaintiff was entitled to an extension of completion time because of compaction difficulties, the issue here presented must be reappraised.

It is, accordingly, recommended that defendant's motion for summary judgment be granted and that plaintiff's motion be denied on the issues discussed in this opinion as overrun, time extensions, impossibility of performance, and Board proceedings; that plaintiff's motion for summary judgment be granted and defendant's motion for summary judgment be denied on the issues discussed in this opinion as Compaction Difficulties (other than impossibility of performance) and Haul Distances; that proceedings in this court be stayed for a period of 90 days under Rule 100 [since September 1, 1969, Rule 167] to permit the Armed Services Board of Contract Appeals to determine (a) the amount of the equitable adjustment and extension of completion time to which plaintiff is entitled consistent with this opinion, because of compaction difficulties, (b) the impact of an extended contract completion date (because of compaction difficulties) on the Cure Notice and on Defendant's Counterclaim, (c) the amount by which an equitable adjustment for the Haul Distance should be increased by considering any fraction of a one-half mile as a one-half mile, and (d) the quantity of wasted material for which an equitable adjustment should be allowed; that the parties comply with Rule 100 [since September 1, 1969, Rule 167] and the appropriate provisions of the General Order of the court of April 1, 1968, implementing it; and that upon conclusion of the Board's proceedings, the parties take further action for the final disposition of the case in this court.